**This document contains materials subject to a Protective Order entered in this action. Its contents are not to be displayed, revealed or made public, except by order of the Court.**

**REDACTED COPY**

Francis J. Earley (FE-7520)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.
666 Third Avenue
New York, New York 10017
(212) 935-3000

*ATTORNEYS FOR AUSTRALIAN GOLD, INC.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

S & L VITAMINS, INC.,

Plaintiff/Counterclaim Defendant,

v.

AUSTRALIAN GOLD, INC.,

Defendant/Counterclaim Plaintiff.

05 CV 1217 (JS)(ML)

AUSTRALIAN GOLD, INC.,

Third Party Plaintiff,

v.

LARRY SAGARIN AND JOHN DOES, 1-10,

Third Party Defendants,

## AUSTRALIAN GOLD'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL

Australian Gold, Inc. ("Australian Gold"), by counsel and pursuant to F.R.C.P. 26, 37, and 45, seeks an order compelling non-parties **REDACTED** to produce documents responsive to the subpoena served by Australian Gold on October 7, 2005, for which they have

failed and refused to respond. Australian Gold also seeks its attorney fees and expenses pursuant to F.R.C.P. 37 for having to file this motion.

## **Factual Background Relevant To The Motion**

*A. The Parties and the Issues*

Australian Gold is the manufacturer and exclusive distributor of Australian Gold®, Caribbean Gold® and Swedish Beauty® tanning lotions and other tanning related products ("Products"). Australian Gold's Products are considered premium tanning lotions in the indoor tanning industry and are sold to the majority of the over 25,000 tanning salons throughout the United States.

Australian Gold distributes the Products through independent distributors for resale to tanning salons and hair care salons that offer on-premises tanning and instruction on the use of the Products. Sales to beauty supply stores, flea markets, internet sellers and other similar outlets are strictly prohibited. Distributors are prohibited from selling the Products to anyone outside of the distribution channel, including to those persons or entities that sell the Products on the internet.

S & L Vitamins filed this lawsuit against Australian Gold seeking declaratory judgment that its purchase and sale of the Products did not violate federal trademark law or interfere with Australian Gold's distributorship agreements with its authorized distributors. S&L Vitamins did not disclose its sources for obtaining the Products in its complaint, and refused to voluntarily do so in communications between counsel for the parties.

Based upon the volume of business that S&L Vitamins does, Australian Gold believes that S&L Vitamins' suppliers are one or more authorized distributors, and that S&L Vitamins is using false pretenses or a straw man to purchase the Products. Thus, Australian Gold filed

counterclaims against S&L Vitamins and claims against Larry Sagarin, its principal, alleging violations of federal trademark and copyright law, interference with contract, and other state law claims.

*B. S&L Vitamins was ordered to disclose its suppliers.*

On July 25, 2005, the Court conducted a status conference. Australian Gold raised the issue that S&L Vitamins sought court approval of its activities yet it had refused to disclose the names of its suppliers. The Court stated that absent "revealing the source" S&L Vitamins' declaratory judgment claims failed because its case was not ripe, and that the identity of the suppliers would still be discoverable in Australian Gold's counterclaims. (Transcript of July 25, 2005 Hearing, at pp. 28-29, for which copies of the relevant pages are attached hereto as *Exhibit A*). The Court ruled that counsel for Australian Gold was entitled to know if he has "a rogue retailer who he can cut off" and ordered S&L Vitamins to disclose its suppliers pursuant to the terms of a protective order, which has since been entered by the Court.

On August 23, 2005, S&L Vitamins, through its counsel, disclosed the names and addresses of four alleged suppliers. These "suppliers" are four retail establishments in the New York area. A true and correct copy of the letter making this disclosure is attached hereto as *Exhibit B*. REDACTED was one of the suppliers identified. The principal at was identified as

*C. Subpoena to*

On October 7, 2005, Australian Gold served subpoenas on all four suppliers, including . Service of process was effected by hand delivery on all four suppliers. A true and correct copy of the subpoena served on and the affidavit for the return of service is attached to the accompanying Declaration of Scott Matthews ("Matthews Decl.") as *Exhibit 1*.

The subpoena requested the following documents:

> 1. Any and all documents related to any communications between you and S & L Vitamins, Inc., thesupplenet.com, Body Source, bodysourceonline.com and/or Larry Sagarin from January 1, 2002 through the present.
>
> 2. Any and all copies of any contracts or agreements between you and S & L Vitamins, Inc., thesupplenet.com, Body Source, bodysourceonline.com and/or Larry Sagarin which have been executed or were in effect from January 1, 2002 through the present.
>
> 3. Any and all documents that reflect all sales made by you to S & L Vitamins, Inc., thesupplenet.com, Body Source, bodysourceonline.com and/or Larry Sagarin from January 1, 2002 through the present for any Australian Gold, Swedish Beauty and/or Caribbean Gold Products or any other tanning lotions.
>
> 4. Any and all purchase orders received by you from S & L Vitamins, Inc., thesupplenet.com, Body Source, bodysourceonline.com and/or Larry Sagarin for the purchase of Australian Gold, Swedish Beauty and/or Caribbean Gold Products or any other tanning lotions.
>
> 5. Any and all invoices related to your sale of Australian Gold, Swedish Beauty and/or Caribbean Gold Products or any other tanning lotions to S & L Vitamins, Inc., thesupplenet.com, Body Source, bodysourceonline.com and/or Larry Sagarin from January 1, 2002 through the present.
>
> 6. Any and all e-mails between you and S & L Vitamins, Inc., thesupplenet.com, Body Source, bodysourceonline.com and/or Larry Sagarin from January 1, 2002 through the present.
>
> 7. Any and all documents related to any ownership interests, management or control of your business by S & L Vitamins, Inc., thesupplenet.com, Body Source, bodysourceonline.com and/or Larry Sagarin.
>
> 8. Any and all documents which identify any distributor or supplier from whom you have ordered or purchased, or attempted to order or purchase, any Australian Gold, Swedish Beauty and/or Caribbean Gold Products from January 1, 2002 through the present, including any and all purchase orders, invoices, contracts, or agreements.

REDACTED response was due on or before October 21, 2005, but they failed to respond. Matthews Dec. at ¶ 5.

    D. *Attempts to Obtain a Response from and*

In an effort to avoid motion practice before the Court, Australian Gold has attempted to resolve this issue through means other than filing a motion to compel. On or about October 28, 2005, Australian Gold's Indianapolis counsel Scott D. Matthews, who was admitted *pro hac vice* in this lawsuit, placed a telephone call to at the telephone number provided by S&L Vitamins and left a voicemail message requesting to contact him. Matthew Dec. at ¶ 6. did not return that telephone call. *Id.*

REDACTED

On October 28, 2005, Australian Gold, by its counsel, sent a letter to and demanding that they contact Mr. Matthews, by 5:00 p.m. on October 31, 2005. Matthews Dec. at ¶ 7. A true and correct copy of that letter is attached to the Matthews Declaration as *Exhibit 2*. Once again, failed to respond. At the time of filing this Motion, had not responded to the subpoena or contacted any of Australian Gold's attorneys. *Id.*

**ARGUMENT**

A. *Failed to Respond to the Subpoena Duces Tecum and Therefore Should be Held in Contempt and Compelled to Respond*

should be compelled to respond to the subpoena and produce all documents relevant to the requests made therein. Australian Gold properly served the subpoena on on October 11, 2005. Further, is within the jurisdiction of this court as New York is located within the Eastern District of New York. *See* Subpoena and Affidavit Return of Service (Ex 1 to Matthews Decl.). had not timely objected to the subpoena or offered any excuse as to why they have failed to respond.

Federal Rule of Civil Procedure 45(d) sets forth a non-party's obligation to respond to a subpoena. It provides:

> (1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
>
> (2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

F.R.C.P. 45(d).

has an affirmative obligation to respond to the subpoena under oath. *See e.g. Securities Investor Protection Corp. v. Executive Securities Corp.*, 433 F.Supp. 470, 474 (S.D. NY. 1977). They must state "under penalty of perjury, either that [they] do[] not have possession of the subpoenaed records and [are] not the custodian[s] of such records or that [they have] another valid excuse for failing to produce them." *Securities Investor Protection*, 433 F.Supp. at 474.

Rule 45(e) provides that "[f]ailure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued." F.R.C.P. 45(e). The failure to account *in any way* for the non-production of the book is prima facie evidence of contempt of the subpoenas duces tecum. *Id.*

In this case, has completely ignored the subpoena and counsel's attempts to secure compliance with the subpoena. Based upon the information provided by S&L Vitamins, Australian Gold has a reasonable belief that possesses information relevant to this lawsuit. It properly invoked its right to subpoena records to verify if in fact is a supplier of S&L Vitamins. This court should hold in contempt of court and compel them to respond to the subpoena. REDACTED

B. *Australian Gold Should be Awarded its Attorney Fees and Costs Associated with this Motion.*

Australian Gold requests that the Court award it its reasonable attorney fees and costs associated with filing this Motion. refusal to respond to the subpoena forced Australian Gold to file this Motion, despite Australian Gold making a good faith effort to obtain compliance without seeking Court intervention.

Under Federal Rule of Civil Procedure 37, sanctions, including attorney fees, are appropriate. Rule 37 provides that if a motion is granted or if the discovery is provided after the motion was filed mandate the award of fees. It provides, in relevant part:

> **the court shall,** after affording an opportunity to be heard, **require the party** or deponent **whose conduct necessitated the motion** or the party or attorney advising such conduct or both of them **to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees**, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

F.R.C.P. 37(a)(4)(emphasis added).

Australian Gold requests that the Court award it reasonable attorney fees and costs. Australian Gold further requests that the Court order it to submit to the Court the fees and expenses it has incurred, and allow the opportunity to respond.

REDACTED

REDACTED

## CONCLUSION

For all of the foregoing reasons, Australian Gold requests that the Court issue an order compelling to produce documents responsive to the subpoena served on October 7, 2005, and award Australian Gold its attorney fees and costs associated with this Motion.

Dated: New York, New York
November 2, 2005

Respectfully submitted,

MINTZ LEVIN COHEN FERRIS GLOVSKY AND POPEO, P.C.

Francis Earley

Francis J. Earley (FE-7520)
MINTZ LEVIN COHEN FERRIS GLOVSKY AND POPEO, P.C.
The Chrysler Center
666 Third Avenue
New York, New York 10017
(212) 935-3000
(212) 983-3115 (Fax)

Michael A. Wukmer, Esq.
Scott D. Matthews, Esq.
ICE MILLER
One American Square, Box 82001
Indianapolis, IN 46282-0200
(317) 236-2179 Phone
(317) 529-5418 Fax

*Attorneys for Australian Gold, Inc.*

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

S&L Vitamins, Inc.,

Plaintiff,

v.

Australian Gold, Inc.,

Defendant.

Docket #CV-05-1217 (JS)

United States Courthouse
Central Islip, New York
July 25, 2005

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE MICHAEL L. ORENSTEIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For The Plaintiff:

David Stein, Esq.
Coleman Law Firm, PC
1350 Broadway-Ste. 1212
New York, NY 10018

Ronald Coleman, Esq.
Coleman Law Firm, PC
1350 Broadway-Ste. 1212
New York, NY 10018

For The Defendant:

Francis J. Earley, Esq.
Mintz Levin Cohn Ferris
Glovsky & Popeo, PC
666 Third Ave.
New York, NY 10017

Scott Matthews, Esq.
Ice Miller
One American Square
Indianapolos, IN 46282

Audio Operator:

Transcribing Firm: Writer's Cramp, Inc.
6 Norton Rd.
Monmouth Jct., NJ 08852
732-329-0191

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

THE CLERK: Calling Civil 2005-1217, S&L Vitamins, Incorporated v. Australian Gold, Incorporated. Please state your appearance.

MR. STEIN: Judge, good morning, David Stein, S-T-E-I-N, here on behalf of the Plaintiffs.

MR. EARLEY: Francis Earley from Mintz Levin for the Defendant, Australian Gold, Inc.

MR. MATTHEWS: Scott Matthews with Indianapolis law firm of Ice Miller for Australian Gold.

THE COURT: Indianapolis, eh?

MR. MATTHEWS: Yes, sir, Judge.

THE COURT: My goodness.

MR. MATTHEWS: I've been getting grief --

THE COURT: You traveled all this way? You must be taking vitamins.

(Laughter)

MR. MATTHEWS: That's right.

MR. EARLEY: He's tan, too, Judge, it's obvious he's got some lotion in there, too.

THE COURT: The only question is, which set? And whose vitamins?

(Laughter)

MR. MATTHEWS: I can assure you --

THE COURT: Or the other question is, whose label?

MR. MATTHEWS: There you go.

THE COURT: Please be seated. Oh -- we have a counterclaim, too, in this -- my goodness. All right. Tell me about the Plaintiff's case first. Since you started this, you get to go first.

MR. STEIN: Judge, we only started it because they made us do it.

(Laughter)

MR. STEIN: Judge, we basically had to file this Declaratory Judgment Action because we had received letters --

THE COURT: Well, what do you want the Court to declare? Tell me about it.

MR. STEIN: That we have not done anything wrong, Judge.

THE COURT: Who can ever say that?

MR. STEIN: Judge?

THE COURT: Who can ever say that?

MR. STEIN: Just in a nutshell, Judge, our client, S&L Vitamins --

THE COURT: Not enough vitamin capsules, eh? You're insisting on a nutshell and not a vitamin capsule?

MR. STEIN: Whatever dispenser you'd like to put it in, Judge, we'll be happy to provide.

THE COURT: Okay.

MR. STEIN: Judge, he sells items over the internet and they happen to be items called Australian Gold and their

products. And --

THE COURT: What is an Australian Gold?

MR. STEIN: That they have suntan products, Judge.

THE COURT: Is that what the (indiscern.) on Australian Gold is? Okay. Well, as you can tell, do I look like I'm suntanned?

MR. MATTHEWS: You have a nice glow.

THE COURT: Oh, okay.

MR. STEIN: In any event, Judge, he's not changing any labels. He's calling it what it is --

THE COURT: So what is he calling it?

MR. STEIN: He's calling it whatever the Australian Gold -- he's selling -- for all intents --

THE COURT: Well --

MR. STEIN: -- and purposes, Judge, he's selling Pepsi Cola --

THE COURT: Well, where's he getting it from?

MR. STEIN: He's getting --

THE COURT: That may be what the problem is.

MR. STEIN: Judge, he gets it from retailers -- not from distributors.

THE COURT: So he buys it retail?

MR. STEIN: Yes, Judge.

THE COURT: And then he sells on the internet?

MR. STEIN: Yes.

THE COURT: Is there an expiration date on this stuff?

MR. STEIN: Not sure, Judge.

MR. MATTHEWS: The -- I'm not sure if it's actually on the bottle, the product does go stale if it sits on the shelf too long.

THE COURT: Well, don't you think you would have an expiration date? I mean, even Budweiser beer puts a date on their beer, right?

MR. MATTHEWS: Right. I'm not sure if we're as sophisticated as Budweiser, but the product does go stale if it's old. And it --

THE COURT: You mean it doesn't tan or it tans unevenly when it's old?

MR. MATTHEWS: It'll -- some of the product, for example, the consistency will go and it just doesn't perform the same way -- some of the products have things to make your skin tingle or you're bronze and it may not --

THE COURT: Tingle?

MR. MATTHEWS: Tingle. That's actually going to be an interesting issue in this case, but --

THE COURT: Is it supposed to tingle or not tingle?

MR. MATTHEWS: It is supposed to tingle.

THE COURT: It's supposed to tingle. So the tingle goes out of it if it's too old, eh?

MR. MATTHEWS: Well, I'm not -- I'm just saying, some of those ingredients may not -- may lose their force, in effect, if they sit on the shelf. I'm not a tanning lotion expert. But I do know they have a shelf life.

THE COURT: Anyway, you're selling their stuff on the internet?

MR. STEIN: No, Judge, they're calling it their stuff.

THE COURT: Okay, so --

MR. STEIN: They're not calling it S&L, and they sent a cease and desist letter --

THE COURT: You call it Australian Gold, or whatever their product is named?

MR. STEIN: Yes, sir. There's no allegation, I don't believe, that we're mislabeling it or calling it something other than what it is. He's not saying it says Mel Tanning Lotions, he's calling Pepsi Pepsi, Judge. And in any event, in January of 2004, they sent a cease and desist letter to our client. We in turn responded with an offer to please supply us with your various bona fides, whatever they may be, as to what you think our client is doing, how he might be violating various contracts that they have with their distributors. My understanding, Judge, is that the following is some exchange in correspondence we did not hear back from them until February of this year, in which case there was a

renewed threat and that's --

THE COURT: Well, how did you send your letter? Pony Express?

MR. STEIN: Judge, sent it -- through the good old United States Mail, fax, and who knows else, Judge. I think there's an allegation that they did not receive it. But in any event, Judge, so in February of 2005 there was a renewal on their part to force the issue, and that's why we decided to jump in with a Declaratory Judgment, Judge. And we will -- what we would be seeking from this Court ultimately is a judgment that we've not done anything wrong and that they're just trying to control their distribution channels, and in essence they're doing it unfairly. Trying to squeeze S&L Vitamins --

THE COURT: Okay. Now, you're not reopening the bottles, anything like that?

MR. STEIN: No, Judge.

THE COURT: Okay. Is this a liquid?

MR. MATTHEWS: Yes.

THE COURT: Okay, now let me hear from -- get the Defendant's side. Which one of you is going to talk about this?

MR. MATTHEWS: I will, Your Honor, thank you.

THE COURT: Okay.

MR. MATTHEWS: This case is unique because a lot of

people will think that tanning lotions are something you can buy at any drugstore, smear it on your body, and you'll get the intended effect.

THE COURT: I thought you only bought it at Saks Fifth Avenue --

MR. MATTHEWS: Well, you might be able to --

THE COURT: Nordstrom, I mean, you know.

MR. MATTHEWS: That's more expensive for my blood, but the indoor tanning industry has really evolved and grown into a very big business --

THE COURT: Yes, all of a sudden, this stuff now works better than it's ever worked, right?

MR. MATTHEWS: It works very well and it --

THE COURT: And before you used to come in and you looked like you turned into a pumpkin.

MR. MATTHEWS: You were orange and blotchy at times. And part of that is because there's better equipment and my client --

THE COURT: Were you rated by Consumer Reports? Were you one of the ones that were rated by Consumer Reports recently?

MR. MATTHEWS: I'm not aware of that report.

THE COURT: I thought Consumer Reports did one on suntan lotion or something like that.

MR. MATTHEWS: I don't know. Australian Gold is one

of the brand names -- that is the name of the parent company -- Swedish Beauty and Caribbean Golds are their other brands --

THE COURT: What are they, the United Nations of suntan lotions? Swedish, Australia -- I mean, you know --

MR. MATTHEWS: All located in the heart roads of America -- crossroads of America in Indianapolis. And this company was started 20 years ago by a husband and wife and they've grown into a leader of tanning lotion manufacturing and distribution throughout the world. And Australian Gold is the leading brand in the country. But these products are distributed to professional tanning salons for use only --

THE COURT: Oh, well, you see, that's part of the problem. You're not supposed to go professional tanning salons anymore. That's dangerous for your health. Don't you read the newspapers on the East Coast here?

MR. MATTHEWS: That's not an issue that we're gonna address today, at least. From my perspective --

THE COURT: What's your SPF on this stuff?

MR. MATTHEWS: The indoor tanning session is usually --

THE COURT: You don't do an SP on the indoor stuff?

MR. MATTHEWS: There is no SPF on the --

THE COURT: There's no (indiscern.) --

MR. MATTHEWS: No, because you --

THE COURT: So you wouldn't wear this on the beach?

It wouldn't -- doesn't supplant Coppertone or Banana Boat, eh?

MR. MATTHEWS: It doesn't. If you wore it outside you'd have no SPF protection and you would burn.

THE COURT: And you don't in the suntanning -- under those suntan lamps?

MR. MATTHEWS: Right. And the suntan lamps control the amount of exposure you get, so these products are designed for indoor use. As I was mentioning earlier, we have very different products. Some products are designed to give you a bronze look instead of the pumpkin look you referred to earlier. Other ones, for example, the tingle product, contains skin irritants and it turns the skin red and that increases blood flow. It allows the tanning process to speed up and give you a better tan.

THE COURT: That brings the blood to the surface?

MR. MATTHEWS: Well --

THE COURT: Not that it increases blood flow, it brings the blood to the surface.

MR. MATTHEWS: You're correct. And that increases the tanning experience. Someone who is fair skinned and uses a tingle product will have a very adverse reaction. Someone with blond hair or red hair could not use that product.

THE COURT: So, you don't use it.

MR. MATTHEWS: I don't use it. And I've put it on my arm, and my arms turned red. They have different tingle

strengths. One of the things Australian Gold is adamant about is --

THE COURT: But then you can tell everybody you went out fishing in Indianapolis.

MR. MATTHEWS: It looks like you have hives, more than --

THE COURT: Okay.

MR. MATTHEWS: -- sunburn.

THE COURT: So, it's an allergic reaction, really?

MR. MATTHEWS: It really is, because it irritates the skin. And for example, I went to a trade show to learn more about this industry, and my wife, I gave her a sample packet. She put tingle on her face and she called me one day crying from work saying, "This product's hurting me." And, so Australian Gold has to be very careful how they use these products with tanning beds and FDA medical advice, and so the idea is that these products are for the indoor market, used in professional salons --

THE COURT: They can only be used in an indoor facility? Or --

MR. MATTHEWS: It --

THE COURT: -- these indoor -- well, then why are the indoor facilities selling it to the people?

MR. MATTHEWS: I'm sorry?

THE COURT: People who come -- are they selling it

to their clients who come in for a tan and they can take it home with them?

MR. MATTHEWS: And they can take it home.

THE COURT: And but so it doesn't have to be used in -- at the salon?

MR. MATTHEWS: Doesn't have to be used at the salon, but it -- but the client who purchases it should understand that this tanning lotion may or may not work with your skin type. This tanning lotion would be better for you. So they're instructed properly. And that is one of the key issues in this case because --

THE COURT: You mean you don't have enough instructions on the bottle?

MR. MATTHEWS: Because everybody's skin -- you cannot just give a chart and say that Mr. Earley here is suitable for this product or not that -- you need -- because everybody's skin is different you need the face to face consultation. The internet, which is what S&L Vitamins is doing --

THE COURT: Well, we sell Viagra over the internet, don't we? Don't you need a face-to-face consultation for that too, at times?

MR. MATTHEWS: Well, perhaps, but in this case it's important, so, that we have the face to face consultation. In any event, that's a little bit about this country -- or

company. And after this lawsuit was filed, we have filed a lawsuit for some of their activities and one of the main problems that we have -- Australian Gold has a distribution network that is a closed distribution system. All distributors are under contract with Australian Gold. The contract prohibits the sale to anyone that's not a tanning salon. You cannot sell to the Wal-Mart, you cannot sell to grocery stores or other chains. You can't sell into retail outlets. They have to be sold to professional salons who offer instruction in use on the product. That is in our contract.

THE COURT: Well, obviously you got a couple of bad middle people there.

MR. MATTHEWS: We do. And one of the issues here in this case is, we believe that S&L Vitamins and Mr. Sagerin have found a hole in our distribution network.

THE COURT: Well, let me ask you a question. Your contracts, are they requirement contracts?

MR. MATTHEWS: No, they are not.

THE COURT: That somebody's got to buy a particular amount?

MR. MATTHEWS: No, they are not.

THE COURT: In order to keep receiving Australian Gold?

MR. MATTHEWS: No, they are not. They are not. They can buy as little as one bottle, although that probably

wouldn't make much business sense for us to have a relationship with that, but there are no requirement contracts.

In any event, Mr. Sagerin and S&L Vitamins have purchased these products from a source. They say it's a retail source. They've asked this Court to declare that their activities -- that they've done nothing wrong and they reiterated that request here today, yet they will not tell us their source. They will not make that known to us. And therefore we believe that they are interfering with our contracts based upon the manner in which it's sold on the internet and the volume they were having to do -- they just simply couldn't obtain these products from other sources.

Perhaps these issues could be narrowed if we had a disclosure from S&L Vitamins that, this is our source and we had an opportunity to do some due diligence and verify that that was the source. We might be able to streamline this case, at least with respect to those claims. But at this point I don't think the other side's willing to do that. They wanna protect their source, at least at this point. The other issue -- and these are allegations that we --

THE COURT: Well, Judy Miller went to jail for that, didn't she? Huh?

MR. MATTHEWS: For now. So, and that's one issue we may have in this case --

THE COURT: Others may follow, but she's certainly

the leader, isn't she?

MR. MATTHEWS: She sure is. So, the other issue with respect to the activities. S&L Vitamins operates an internet website. Our contracts with our distributors are for United States products for sale in the United States. These distributors can only sell in the United States. European countries have different labeling requirements that must be followed. And we have information that we've just discovered that will -- we will be -- it's our intention I believe to amend our counterclaims because we understand that S&L Vitamins is now selling into Europe, selling the U.S. products. And those products are not genuine products in the European market. They're not authorized to be sold in Europe.

THE COURT: So, what's the European Union doing about this? Don't they have their own trade laws now?

MR. MATTHEWS: Well, and I don't know the answer to that --

THE COURT: You know, the ones that France and the Netherlands, and Belgium turned down? You remember them, right?

MR. MATTHEWS: Yeah, I don't know what's happening. We just discovered this information recently. So, that's another allegation and a fact where the products are being distributed in a manner that was not intended, and certainly products that should not be leaving the United States. The

other allegations that our client has are the way in which the products are advertised. On the website, there is a photograph of the Australian Gold product. Over that photograph --

THE COURT: Can I ask you a question? What's so different about your product versus some of the other over-the-counter products that are sold out there? Is there a difference?

MR. MATTHEWS: From what --

THE COURT: Tanning -- bottle of the stuff -- they can buy in CVS or Eckerd or --

MR. MATTHEWS: You know --

THE COURT: Difference between your -- Australian Gold and these other products which promise you a wonderful tan.

MR. MATTHEWS: Well, I think the things that you see in CVS and Eckerd are the outdoor market products. The indoor products --

THE COURT: No, I'm not talking about outdoor. I'm talking about indoor. I believe indoor --

MR. MATTHEWS: Okay. I don't know the answer --

THE COURT: There's a whole series of this stuff out now for women -- particularly the women, because the men generally don't get involved in it. There are men who do, but generally it's the women who buy this stuff.

MR. MATTHEWS: Well, I know that -- like I said, for

example, the bronzer and the tingle products are things that I don't think you see outside of tanning salons, and I don't believe all the other manufacturers, if any, have the tingle. I think some do but that is a different type of product, so there's --

THE COURT: You can't buy this stuff at Macy's at the makeup counter, eh?

MR. MATTHEWS: I don't think -- well, I --

THE COURT: Or Bloomie's at the -- Bloomingdales, I mean --

MR. MATTHEWS: Right.

THE COURT: -- I forgot you're -- I don't know if there's a Bloomingdales in Indianapolis yet.

MR. MATTHEWS: No there's --

THE COURT: Are they yet?

MR. MATTHEWS: We have a Macy's.

THE COURT: Okay, well, it's the same ownership, so --

MR. MATTHEWS: Yeah.

THE COURT: Federated Department Stores, so --

MR. MATTHEWS: I don't -- honestly, I haven't visited the makeup counter in a while, so I don't know the answer to whether or not you can buy it at Macy's.

THE COURT: You're just going to have to go along with your wife.

MR. MATTHEWS: I know better. If I bought it, she wouldn't wear it. So, I don't know the answer to that.

THE COURT: Okay.

MR. MATTHEWS: But anyway those are allegations. The manner in which they're advertising the products. They're putting their name over our photographic images, suggesting that there's a sponsorship and affiliation between S&L Vitamins and our products that is not there. And in fact that causes us harm in the --

THE COURT: Didn't I just see a case from the 2nd Circuit come down, Star Distributors against somebody? Not on suntan, but in a trade dress -- trademark-type thing?

MR. MATTHEWS: I'm not familiar with that one. There is a --

THE COURT: Last month, in June 2005?

MR. MATTHEWS: There are some cases -- the thing that these folks are doing, they're paying to use Australian Gold's trademark with Yahoo. And they've also put it in the metatags, which is the source code. And there's --

THE COURT: Oh, so we got -- yes, there's a case in the 2nd Circuit dealing with these popup ads.

MR. MATTHEWS: There was a recent case on the popup ads, I'm not sure that's directly on point.

THE COURT: Not directly, but now that you're talking about internet and you're saying that they're putting

their stuff on top of your stuff and --

MR. MATTHEWS: Right, and I think -- so that issue is gonna be --

THE COURT: You read that case yet?

MR. STEIN: I believe I did, Judge. Was it involving When You --

THE COURT: Yes, When You Come and 1-800 -- right --

MR. STEIN: I did read it and I don't remember specifically, nor do I --

THE COURT: And there was another trade case with Star -- involving Star something or other. I think it was -- was it Giorgio?

MR. MATTHEWS: Not the --

THE COURT: Might have been the Giorgio case?

MR. STEIN: I don't recall the --

THE COURT: Giorgio Vodka vs. something or other Rum --

MR. STEIN: All I know --

THE COURT: And Bacardi Rum.

MR. MATTHEWS: Yeah, I've read the --

THE COURT: Star Distributors -- I think it's the Bacardi vs. the Giorgio folks.

MR. MATTHEWS: Well, I've read the When You case and actually, we're waiting on a decision on the 10th Circuit on the initial interest confusion on the use of the trademarks in

the metatags for the same client that was litigated in Oklahoma two years ago. And it's been briefed in the 10th Circuit.

THE COURT: Now, they had affirmed Judge Bayer on the case, didn't they, in the 1-800 case? Or When You Come, right?

MR. STEIN: I believe so, Judge.

THE COURT: Yes, that was an affirmance of Judge Bayer who did do some injunctive work there, right?

MR. STEIN: Again, I don't remember specifically --

THE COURT: Do you remember when you read it?

MR. STEIN: I remember when I read it --

THE COURT: You'll remember it when you read it. Going to have an effect on you.

MR. STEIN: I don't --

THE COURT: Or your popups.

MR. STEIN: There's no allegation of popups here either, Judge.

THE COURT: No. Well --

MR. STEIN: But --

THE COURT: It's not a question of popup, it's a question of the source.

MR. MATTHEWS: Right.

THE COURT: The identification with them as a source.

MR. MATTHEWS: Right.

MR. STEIN: Judge, I --

THE COURT: And that's not a good thing. I'll tell you that right now.

MR. STEIN: As a general proposition, though, I do believe that the 2nd Circuit is very much supportive of what's happening in this case, Judge.

THE COURT: Well, I don't know about internet. When you look at the 1-800 case and the case that we're just now talking about. I do agree with you that with regard to some of the cases which involved Quality King --

MR. STEIN: Then there was the John Paul Mitchell -- it's cited in --

THE COURT: Now the John Paul Mitchell I understand and I believe that the Quality King cases when we're talking about -- but that's a different type of thing.

MR. STEIN: Judge, the -- as to the matter --

THE COURT: One -- in one of those cases, they were selling expired products. Another one was cleared issue as to whether or not the shampoo was counterfeit. Okay?

MR. STEIN: Again, Judge, these are nonissues here.

THE COURT: Oh --

MR. MATTHEWS: Well, to the extent that we have counterfeit product in Europe or nongenuine products --

THE COURT: All right, now, are your contracts of sale -- are they exclusive or not?

MR. MATTHEWS: They are not exclusive with -- the contracts at issue are distributorship agreements for the United States. These distributors can sell other manufacturers' products --

THE COURT: Okay.

MR. MATTHEWS: And there are no exclusive territories --

THE COURT: Now, the reason why I make a comment about Quality King is because at one time Quality King did get its stock from other distributors that were being sold by -- either whether it was John Paul Mitchell or whether it was being some of the other outfits --

MR. MATTHEWS: Right, and in Quality King I think it was --

THE COURT: Or Nexxus, which is also supposed to have been only sold in salons, if you recall. Nexxus' contracts I believe also were very similar to yours.

MR. MATTHEWS: And I think the Quality King case was where he was getting it from a middle man in China so there was an intervening party --

THE COURT: Yes, but what were those products doing in China?

MR. MATTHEWS: I don't know.

THE COURT: Oh, okay.

MR. MATTHEWS: And I may have the cases confused --

THE COURT: He was getting them from -- actually, was getting them from Europe. And what was happening in the Quality King cases is that the people were buying the stuff because -- that's why I asked you whether there were requirement contracts. And the only way they can meet their requirements was to dump them off and keep -- in order to keep the relationship going. That's why that's going to be part of the discovery as to whether or not any of your retailers that you're selling to -- these salons -- think that they have to buy a certain amount to continue receiving product.

MR. MATTHEWS: And they do not.

THE COURT: I do not know. Well, you say that, I don't know about what -- your retailer, you know -- I'm not in the mind of your tanning salons. In any event I think you do have to -- you know, you do have a problem if what he's saying is true with regard to how you're putting your label on or how you're labeling your stuff on the net. In your catalog. If there is a --

MR. STEIN: With the metatags --

THE COURT: -- false -- if there is a confusion as to false origin, then I think you have a problem.

MR. STEIN: Judge, with respect to the metatags, #1, I don't know for -- I'm not here to tell the Court that he even has metatags, but #2, even if he has the metatags that say Australian Gold, Judge, there's absolutely nothing wrong with

doing that according to Terry Wells case in 9th Circuit which is the standard. He calls it Australian Gold, and if he says that in the metatags there's absolutely nothing wrong with doing that.

THE COURT: Well, however, if he's putting it under the name of S&L Vitamins somewhere -- but let's not talk about Europe at the moment. I mean, because I suspect that Europe is going to have its own little thing here. You know, from the standpoint of the amendment, I'm not going to get involved in it at the moment. But from the standpoint of linking S&L with Australian Gold, in -- on your site, forgetting whether you can sell or not sell their product. Forgetting that issue -- whether or not you -- with your linkage of S&L with it, may be a problem -- under the Lanham Act.

MR. STEIN: If he's doing such a thing, Judge, and I don't believe that he is --

THE COURT: Well, the web -- the site shows what he's doing and what he's not doing. Whether they have copies of the site, I don't know. It's a site that's out there for everybody, right? I don't know what they're doing.

MR. STEIN: Judge, if he's (indiscern.) --

THE COURT: All I can tell you is if you're putting S&L as the -- as a link to Australian Gold then you may or may not have a problem there.

MR. STEIN: He's -- Judge, if he's Playmate of the

Year he can say he's Playmate of the Year. So, he's saying -- I sell Australian Gold. He's selling Australian Gold. It's not that he's saying I sell Australian Gold and I don't --

THE COURT: I understand. Now, suppose you put on your bottle, "To be sold only in salons" --

MR. MATTHEWS: We do not.

THE COURT: What do you think would happen?

MR. MATTHEWS: I don't think it matters under the case law this Circuit at least what I've read. And we don't put that on our bottle.

THE COURT: Why not?

MR. MATTHEWS: I don't know the answer to that, Judge.

THE COURT: Oh. You really want the help of this Circuit, don't you think that would be a good idea?

MR. MATTHEWS: I think we --

THE COURT: Don't you think that would be a good idea, that the labeling show that?

MR. MATTHEWS: I think that's a good idea to put that.

THE COURT: Otherwise, how are you going to limit the sales?

MR. MATTHEWS: Well, we do it by contract and enforcing the contract.

THE COURT: That may be, but anybody can get a hold

of this stuff. Suppose I'm Mrs. Smith and I go down to the Sunny Salon, and I buy myself a bottle of Australian Gold, and then I go out and sell it --

MR. MATTHEWS: Well, I can't --

THE COURT: What's the difference?

MR. MATTHEWS: I can't control what Mrs. Smith does because that's beyond the First Sale Doctrine.

THE COURT: Well, Mrs. Smith puts it out on eBay.

MR. MATTHEWS: That's right, I can't control Mrs. Smith --

THE COURT: You can't control eBay either, right?

MR. MATTHEWS: Cannot control eBay.

THE COURT: So, it can go on eBay, a bottle of your Australian Gold. It still suffers the same detriments that S&L suffers from, right?

MR. MATTHEWS: It -- my client tells us that every day and don't -- and it's hard to understand because eBay causes the same harm. The difference here is the manner in which we believe it's being acquired. And that's gonna be a big discovery issue in this case because in the initial disclosure --

THE COURT: Well, I agree, and I assume that the two sides --

MR. MATTHEWS: They sent no documents and they didn't disclose the source. And if they're gonna seek

Declaratory Judgment, I mean, I think that's the thing that has to be done.

THE COURT: Well, I don't think they're going to get a Declaratory Judgment without doing that, Counsel.

MR. STEIN: Judge --

THE COURT: On a highly confidential basis, only Counsel --

MR. STEIN: Absolutely, Judge.

THE COURT: Well, I'm waiting for someone to say the magic words.

MR. STEIN: Judge, we --

MR. MATTHEWS: We would --

MR. STEIN: I am not in a position to speak at this time for what my client would agree to, but I do know that when we get the letter -- when he gets the letter from Ice Miller saying I'm going to sue you unless you tell me your sources, you can bet that you have a guy that's not going to go public, and he didn't. And they got a fight on their hands because of that.

THE COURT: Well, I'm --

MR. STEIN: But if --

THE COURT: What I'm going to say to you is simple. Absence revealing the source -- first of all, your case falls apart because you don't have a case ripe for controversy. Second of all, it's discoverable on the counterclaim. Which

then takes over the main case since your case would be dismissed, since you don't have a case of controversy. That's right. Otherwise, you can't be selling this stuff and therefore you have nothing to seek a Declaratory Judgment about according to your case. On the other hand, that doesn't dismiss the counterclaim and it is a discoverable item. So what I am merely suggesting is that the two sides enter into a highly confidential -- a Confidentiality Order, a Protective Order which is a highly confidential -- which is only open to Counsel and retained expert. Only retained -- no in-house expert, no in-house Counsel --

MR. STEIN: Judge, I'm going to -- I'm gonna need to know that -- about the relationship between Ice Miller and Australian Gold, because as far as I'm concerned, if Scott Matthews is the voice of CEO Australian Gold that's very dangerous. Frank Earley might be differently situated, but likewise --

THE COURT: I indicated that if he's in-house Counsel, he is not retained Counsel outside Counsel, then it's -- the information is not going in that direction. That's what the purpose of highly confidential is. To distinguish it from confidential which does go to Counsel -- all Counsel and to all the officers. This does not go to officers or in-house Counsel. Not interested in interfering with your relationship with your retailers -- at the same time, Counsel is entitled to

know whether he's got a rogue retailer who he can cut off. And therefore that cuts off your supply line, but that's not a -- that's not your -- that's not my problem. They're entitled to do that, if they've got somebody violating their contract.

MR. STEIN: Well --

THE COURT: They can cut it off.

MR. STEIN: Then I -- if -- then I'm missing the confidentiality part of it, Judge. If they wanna know whether it's a retailer or not and we can disclose it to the Court and the Court would tell whether it is a retailer or not, that's one thing, but if it goes to them and they go ahead and take action, then my guy's out of business and they got just what they wanted.

THE COURT: But the point is they don't have your action against you, they have it against their own contract vendor -- vendee. Which they're entitled to under their agreement.

MR. MATTHEWS: And Your Honor, if it's a legitimate retailer, as Counsel suggests, we can't take action --

THE COURT: Well, you're the one who's shown up with the product and they want to know how you show up with their product. All you can do is prevent possibly a lawsuit against yourself. On the other hand, a lawsuit remains and since you are selling it as to whether or not you are identifying them as your source in your ads or in your net, you have a problem.

Because if there's a problem with the labeling, for example, in Europe, or if there is not the so-called one on one, or consultation and you -- and a fair-skinned person uses the wrong product, you have a liability, together with them. And they're entitled to know who is selling it without giving that consultation. And you're dealing with a public safety issue.

MR. STEIN: Judge, Selsun Blue tingles and I don't believe that they --

THE COURT: I don't know if it does or it doesn't, but the fact of the matter --

MR. STEIN: They're not tanning products.

THE COURT: But Counsel, you have to understand, the name -- if you, you know, you -- whether you drop your lawsuit or not for declaratory judgment or not, you're going to be giving up the source.

MR. STEIN: Judge, again, I think that we could -- we would give up the source --

THE COURT: Otherwise there's going to be an injunction against you and you're going to take it off the net. And the people who operate the net are going to be told not to accept S&L. And there will go your net presence. You got it? That will be part of the injunction in the case. Well -- I think you got to talk to your client as to what he or she wants to do. I would suggest he open a salon.

(Pause in proceedings)

THE COURT: Was the mandatory disclosure done?

MR. MATTHEWS: Well, we don't think it was complete, but it was done.

(Pause in proceedings)

THE COURT: When are you going to have a complaint by -- or the answer by?

MR. MATTHEWS: Thursday is our deadline to respond to the Motion to Dismiss so we anticipated doing that on Thursday. And then I think under Eastern District case law, that would moot our need to respond to the Motion to Dismiss as it would moot it. But we just want to confirm that with the Court.

THE COURT: Well, you've already served an answer, have you not? With the counterclaim, have you not?

MR. MATTHEWS: We answered on the counterclaim but they have not filed a responsive pleading with respect to the counterclaim.

(Pause in proceedings)

THE COURT: Well, it's time for discovery.

MR. MATTHEWS: I think we're gonna have some discovery issues because of the reluctance to give up source, but even if we didn't, because we're located in Indianapolis, our officers are located in Indianapolis and S&L Vitamins is here in New York -- and because I believe we will retain an expert on our case, we would suggest nine to 12 months to

complete discovery.

MR. STEIN: Judge, I think we have no problems with that.

(Pause in proceedings)

THE COURT: Okay, I will see you in October.

(Court adjourned)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Signature of Transcriber

10-18-05
Date

# **EXHIBIT B**

THE DIAMOND BUILDING
881 ALLWOOD ROAD
CLIFTON, NEW JERSEY 07012
973.471.4010
FAX 973.471.4646

1350 BROADWAY - SUITE 1212
NEW YORK, NEW YORK 10018
212.752.9500
FAX 212.752-9506

REPLY TO: Clifton

WWW.COLEMAN-FIRM.COM

COLEMAN LAW FIRM
A PROFESSIONAL CORPORATION

Fax

| | | | |
|---|---|---|---|
| **To:** | Frank Earley, Esq. | **From:** | David M. Nieporent |
| **Fax:** | 212-983-3115 | **Pages:** | 3, including cover sheet |
| **Phone:** | 212-692-6230 | **Date:** | August 23, 2005 |
| **Re:** | S&L vs. Australian Gold | **CC:** | |

☐ **Urgent** ☐ **For Review** ☐ **Please Comment** ☐ **Please Reply** ☐ **Please Recycle**

● **Comments:**

Rule 26.

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE UNITED STATES POSTAL SERVICE. THANK YOU.

**COLEMAN LAW FIRM**
A PROFESSIONAL CORPORATION

RONALD D. COLEMAN
JANE COLEMAN (ADMITTED IN NY ONLY)
NANCY EXUME
DAVID STEIN (ALSO ADMITTED IN PA IL AND DC)

PETER S. FRIEDMAN
DAVID MARC NIEPORENT (ADMITTED IN NJ ONLY)

DAVID WEINSTEIN - OF COUNSEL
LAWRENCE HERSH - OF COUNSEL
(ALSO ADMITTED IN CA, IL AND REGISTERED TO PRACTICE BEFORE THE U.S. PATENT AND TRADEMARK OFFICE)

1350 BROADWAY
SUITE 1212
NEW YORK, NY 10018
212-752-9500
FAX 212-752-9506

THE DIAMOND BUILDING
881 ALLWOOD ROAD
CLIFTON, NJ 07012
973-471-4010
FAX 973-471-4646

WWW.COLEMAN-FIRM.COM

August 23, 2005

**VIA FACSIMILE**

Francis J. Earley, Esq.
Mintz Levin Cohn Ferris Glovsy and Popeo, P.C.
Chrysler Center
666 Third Avenue
New York, NY 10017

Re: S&L Vitamins v. Australian Gold
05-CV-1217 (JS) (MLO)

Dear Frank:

As per your conversation with my colleague David Stein earlier today, enclosed please find our supplemental Rule 26 disclosures, constituting the identity of the retailers who are our clients' suppliers of Australian Gold products. Please note that, as per the protective order entered by Magistrate Judge Orenstein on August 11, this information is CONFIDENTIAL-ATTORNEY'S EYES ONLY.

Please contact us if you have any questions about the above.

Very truly yours,

David M Nieporent

David M. Nieporent

Enc.

CONFIDENTIAL-ATTORNEYS EYES ONLY
SEALED BY COURT ORDER, S&L VITAMINS v. AUSTRALIAN GOLD, INC.

**RULE 26 DISCLOSURES**
**ADDITIONAL WITNESSES**

Retail establishments where Australian Gold products are purchased.

REDACTED

CONFIDENTIAL-ATTORNEYS EYES ONLY
SEALED BY COURT ORDER, S&L VITAMINS v. AUSTRALIAN GOLD, INC.