F I L E D
U.S. DISTRICT COURT, E.D.N.Y.
IN CLERK'S OFFICE
LONG ISLAND COURTHOUSE

★  SEP 3 0 2007  ★

ENTERED

★ ————— ★

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
S&L VITAMINS, INC.,

        Plaintiff,

   -against-

AUSTRALIAN GOLD, INC.,

        Defendant.

------------------------------X

               MEMORANDUM AND ORDER
               05-CV-1217(JS)(MLO)

APPEARANCES:
For Plaintiff and      Ronald D. Coleman, Esq.
Third-Party Defendants: Coleman Law Firm
Larry Sagarin and      1350 Broadway, Suite 1212
John Does 1-10        New York, NY 10018


For Defendant:         Francis Earley, Esq.
                   Mintz Levin Cohn Ferris Glovsky
                   & Popeo PC
                   666 Third Avenue
                   New York, NY 10017


SEYBERT, District Judge:

      Presently pending before the Court is Plaintiff S&L

Vitamins, Inc. ("S&L Vitamins" or "S&L") motion for summary

judgment and Defendant Australian Gold's ("AG") motion for partial

summary judgment. For the reasons explained below, S&L's motion is

GRANTED in part and DENIED in part and AG's motion is GRANTED in

part and DENIED in part.

## PROCEDURAL BACKGROUND

      On March 4, 2005, S&L Vitamins commenced the instant

action seeking a declaratory judgment that its sale of AG's products did not, <u>inter alia</u>, constitute trademark infringement. AG answered the Complaint, alleging counter-claims against S&L Vitamins for copyright infringement, trademark infringement, unfair competition, trademark dilution, tortious interference with contract, tortious interference with prospective economic advantage, deceptive business practices, and false advertising. AG also filed a Third-party Complaint, alleging similar claims against Larry Sagarin ("Sagarin"), the owner of S&L Vitamins.[1]

While S&L's motion for judgment on the pleadings was pending, AG moved for leave to file a Second Amended Answer. With S&L's consent, the Court granted the motion for leave to amend. Accordingly, on September 14, 2005, AG filed its Second Amended Answer with Counterclaims, alleging that S&L (1) copied AG's copyrighted works; (2) used AG's Marks without authorization or permission, and/or manipulated AG's Marks in order to give a false impression of affiliation in violation of federal law and New York State law; (3) engaged in unfair competition in violation of the Lanham Act, and New York state law; (4) diluted the distinctive quality of the Marks; (5) tortiously interfered with AG's Distributorship Agreements; (6) tortiously interfered with AG's

---

[1] Hereinafter, all references to "S&L" shall include both the company and Sagarin.

business relationships in the United States and abroad; (7) conducted deceptive business practices in violation of New York General Business Law §§ 133, and 349; and (8) falsely advertised AG's products in violation of the Lanham Act and New York General Business Law § 350.

As a result, the Court construed S&L's Motion for Judgment on the Pleadings as pertaining to AG's Second Amended Answer with Amended Counterclaims and Third Party Complaint. However, because no Answer had been filed with respect to the Amended Counterclaims and Cross Claims, the Court construed S&L's motion as filed pursuant to Rule 12(b)(6). On March 30, 2006, the Court granted in part and denied in part S&L's motion to dismiss. Specifically, the Court dismissed AG's claims pursuant to New York General Business Law §§ 349 and 350 and denied the remainder of S&L's motion.

S&L now asks the Court to grant its request for a declaratory judgment and to summarily dismiss all AG's remaining counterclaims. AG also seeks summary judgment with respect to its federal claims for copyright infringement, trademark infringement and unfair competition and with respect to S&L's third cause of action for unfair competition.

FACTUAL BACKGROUND

The following facts have been taken from the parties Rule

3

56.1 Statements and Counter-Statements and the exhibits annexed thereto.

AG is an Indiana corporation with its principal place of business in Indianapolis, Indiana. (AG R. 56.1 Stmt. ¶ 3.) AG manufactures tanning lotions and other related tanning products that are sold to a majority of the tanning salons throughout the United States. (<u>Id.</u> ¶ 4.) AG is the manufacturer and exclusive distributor of "Australian Gold," "Caribbean Gold," and "Swedish Beauty" tanning lotions ("Products"). (<u>Id.</u> ¶ 5.) AG owns or is the licensee of registered and common law trademarks ("Marks") for these Products. (<u>Id.</u> ¶ 6.) In addition, AG has created artwork, which it has copyrighted, for use on the labels of its Products. (<u>Id.</u> ¶ 8.)

S&L is a New York corporation with its principal place of business located in New York. (<u>Id.</u> ¶ 1.) S&L does business on the internet at two web addresses: www.thesupplenet.com, and www.bodysourceonline.com (collectively, the "Websites"). (S&L R. 56.1 Stmt. ¶ 7.) S&L also owns a retail store located in Lindenhurst, New York. (AG R. 56.1 Stmt. ¶ 27.)

S&L sells the Products to the public through the Website and/or at its retail location. (<u>Id.</u>) AG claims that S&L's use of its Marks and distribution of its Products via the Website violates AG's copyrights and trademarks, and tortiously interferes with its

4

distribution contracts.

## AG's Distribution Of The Products

AG distributes its Products through independent distributors ("Distributors"). (Id. ¶ 10; S&L R. 56.1 Stmt. ¶ 12.) The Distributors' ability to resell the Products is limited by the terms of a "Distributorship Agreement." (AG R. 56.1 Stmt. ¶ 11; S&L R. 56.1 Stmt. ¶ 12.)

The Distributorship Agreement provides that the Products only be sold to "a salon environment where they have tanning as a majority of their business." (AG R. 56.1 Stmt. ¶ 11.) Sales to internet sellers, such as S&L, and other retailers, who will re-sell the Products to the general public without guidance and training are prohibited. (Id. ¶¶ 20, 22-23.)

In addition, the Distributorship Agreement requires that the distributor work with AG on training the distributor's staff and the salons to which they sell. (Id. ¶ 12.) In a typical year, AG trains over 30,000 employees, salon owners and managers on the proper use of the Products and has spent over $1.5 million in training to date. (Id. ¶¶ 15-16.) While these facts are not disputed, whether all distributors receive training and the extent of the training is disputed. (S&L R. 56.1 Stmt. ¶¶ 56-57, 66, 68.)

AG contends that it has expended substantial time and effort to preserve the integrity of its Marks and distribution

strategy. For example, AG routinely performs "store checks" to ensure that the Products are being sold to businesses operating as tanning salons as defined in the Distributorship Agreements. (AG R. 56.1 Stmt. ¶ 21.)

S&L's Acquisition And Sale Of The Products

S&L is not party to a Distributorship Agreement with AG and it is not a salon as defined in such agreement. (Id. ¶ 33.) Furthermore, S&L does not receive or participate in any training regarding indoor tanning safety. (Id. ¶ 34.) S&L acquires the Products from various tanning salons, not Distributors. (Id. ¶ 35.) S&L then re-sells the Products on its Websites at a substantial discount – approximately 50% of the retail price at authorized tanning salons. (Id. ¶ 37.)

S&L's Websites contain a number of links that direct a computer user to a listing of all products according to brand name, including AG's brands. (Id. ¶ 41.) When a computer user clicks on a brand name, the person is directed to a listing of the products offered for sale by S&L, including AG's Products using AG's Marks. (Id. ¶ 42.) The Websites also contain thumbnail pictures of the Products, which, when clicked on, produce a larger, full image of the Products. (Id. ¶¶ 47-49.) Essentially, S&L places photographs of AG's Products on its Websites, which S&L then modifies by adding S&L trade names and logos adjacent to or superimposed over the

6

images. (Id. ¶ 51.) In addition, S&L adds the phrase "All Rights Reserved" directly beneath the images. (Id. ¶ 52.) S&L does include a brief disclaimer at the bottom of the web page with the thumbnail listings, which states "Tanning Lotion Disclaimer Body Source is Not affiliated with ANY Tanning Lotion manufacturer. To see full Disclaimer Click here." (Id. ¶ 54; Exs. I, J (emphasis in original).) Neither the brief disclaimer nor the full disclaimer specifically identify AG, its Marks or copyrights. (Id. ¶ 56.)

S&L promotes sale of the Products using "pay for placement" service, whereby a business can pay to "sponsor" certain search terms. (Id. ¶ 58.) An entity that sponsors a given search term (or terms) will have its name and web address appear at the top of the list of "hits" for the term. (Id. ¶ 59.) For example, S&L's Website is listed near the top of the search results for the terms Australian Gold and Swedish Beauty. (Id.) S&L's also uses the Marks in the HTML source code and metatags[2] for its Website.

On January 15, 2004, AG sent a cease and desist letter to S&L. (Id. ¶ 64.) The cease and desist letter informed S&L of AG's prohibition on internet sales of the Products. AG also provided S&L with a copy of the Distributorship Agreement. (Id. ¶ 65;

---

[2]    Metatags are "hidden code used by some search engines to determine the content of websites in order to direct searchers to relevant sites." Playboy Enterprises v. Welles, 279 F.3d 796, 800 n.2 (9th Cir. 2002)

7

Sagarin Dep. 150.)

DISCUSSION

The parties have cross-moved for summary judgment and their arguments address a number of overlapping issues. The Court will address each cause of action and argument in turn; however, to the extent the parties arguments address a common issue, the Court will address the arguments simultaneously.

I.    Standard Of Review On Summary Judgment

"Summary judgment is appropriate where there is no genuine dispute concerning any material facts, and where the moving party is entitled to judgment as a matter of law." Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998)(citing Fed. R. Civ. P. 56(c)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). "In assessing the record to determine whether there is a genuine issue to be tried as to any material

8

fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee, 109 F.3d at 134.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256). "Mere conclusory allegations or denials will not suffice." William v. Smith, 781 F.2d 319, 323 (2d Cir. 1986). Indeed, when a motion for summary judgment is made, it is time to "to put up or shut up. . . . [U]nsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41 (internal citations omitted). Furthermore, "[w]here cross-motions for summary judgment are filed, a court 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Hotel Employees & Rest. Employees Union, Local v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002) (internal quotation marks omitted). It is within this framework that the Court addresses the present summary judgment motions.

II. AG's Claims For Trademark Infringement And Unfair
    Competition

The parties move for summary judgment based on different
theories of trademark infringement. S&L moves for summary judgment
on AG's direct trademark infringement and unfair competition claims
based on the following reasons: (1) S&L's activities are protected
by the "first sale doctrine;" (2) none of S&L's activities suggest
sponsorship or endorsement by AG because there is no trademark
"use" and no likelihood of confusion; and (3) S&L's activities are
protected by the "nominative fair use doctrine." AG argues that
(i) neither the first sale doctrine nor the nominative fair use
doctrine apply, (ii) there is a likelihood of confusion, and (iii)
factual issues exist as to whether S&L is selling "genuine" AG
products. Additionally, AG has cross-moved for summary judgment on
its trademark infringement and unfair competition claims based on
a theory of false designation of origin, or reverse passing off,
under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The
Court will address each argument in turn.

In order to prevail on a claim for trademark
infringement, regardless of the theory, AG must establish that "(1)
it has a valid mark that is entitled to protection under the Lanham
Act; and that (2) [S&L] used the marks, (3) in commerce, (4) 'in
connection with the sale . . . or advertising of goods or

10

services,' without [AG's] consent." <u>1-800 Contacts, Inc. v. When</u>
<u>U.com</u>, 414 F.3d 400, 407 (2d Cir. 2005) (<u>quoting</u> 15 U.S.C. §
1114(1)(a)); <u>see also</u> <u>Playtex Prod., Inc. v. Georgia-Pacific Corp.</u>,
390 F.3d 158, 161 (2d Cir. 2004); <u>Time, Inc. v. Petersen Publ'g</u>
<u>Co., L.L.C.</u>, 173 F.3d 113, 117 (2d Cir. 1999); <u>Fragrancenet.com,</u>
<u>Inc. v. Fragrancex.com, Inc.</u>, 439 F. Supp. 2d 545, 2007 U.S. Dist.
LEXIS 48373, at *6 (E.D.N.Y. 2007). In addition, AG must show that
S&L's use of the mark is likely to "cause confusion, or to cause
mistake, or to deceive." 15 U.S.C. § 1114(1)(a); <u>see also</u> <u>1-800</u>
<u>Contacts</u>, 414 F.3d at 407.

Although the parties jump to arguments concerning
confusion and first sale doctrine, the Court must first determine
whether there exists trademark "use" under the Lanham Act. Indeed,
if S&L has not "used" the Marks, there is no violation under the
Lanham Act, regardless of the theory.

A.   <u>Trademark "Use"</u>

As the Second Circuit has explained:

> Not only are "use," "in commerce," and
> "likelihood of confusion" three distinct
> elements of a trademark infringement claim,
> but "use" must be decided as a threshold
> matter because, while any number of activities
> may be considered "in commerce" or create a
> likelihood of confusion, no such activity is
> actionable under the Lanham Act absent the
> "use" of a trademark.

<u>1-800 Contacts</u>, 414 F.3d at 412 (<u>quoting</u> 15 U.S.C. § 1114).

1.  "Use" Of Marks In Search Engines And Metatags

The issue of whether use of a trademark in metadata or as part of a sponsored search constitutes trademark "use" under the Lanham Act has been extensively litigated in recent years. See Site Pro-1, Inc. v. Better Metal, LLC, No. 06-CV-6508, 2007 U.S. Dist. LEXIS 34107, at *6-7 (E.D.N.Y. May 9, 2007) (collecting cases addressing this issue). As S&L correctly points out, the general rule in this Circuit is that use of a trademark in keywords and metatags, where the use is strictly internal and not communicated to the public, does not constitute Lanham Act "use" and, therefore, does not support a Lanham Act claim. See, e.g., Frangrancenet.com, 2007 U.S. Dist. LEXIS 48373, at *14. Courts in other circuits, however, have generally found "use" to exist in such situations. See, e.g., Australian Gold Inc. v. Hatfield, 436 F.3d 1228 (10th Cir. 2006) (finding "use" where the mark was used in metadata); Brookfield Comm'ns v. West Coast Entertainment, 174 F.3d 1036 (9th Cir. 1999) (same); J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC, No. 06-CV-0597, 2007 U.S. Dist. LEXIS 288, (E.D. Pa. Jan. 4, 2007) (finding "use" where the mark was used in metadata and in sponsored searches); Buying for the Home, LLC v. Humble Abode, LLC, 459 F. Supp. 2d, 310 (D. N.J. 2006) (finding sponsored searches to constitute "use").

Under the Lanham Act, "use in commerce" is defined, in

relevant part, as follows:

> a mark shall be deemed to be in use in commerce –
> (1) on goods when –
> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, than on documents associated with the goods or their sale, and
> (B) the goods are sold or transported in commerce . . . .

15 U.S.C. § 1127(1). Courts in this Circuit, relying on the Second Circuit's reasoning in 1-800 Contacts, have consistently held there is no trademark "use" where a defendant does not place the trademark on any product, good, or service and where it is not used in a way that would indicate source or origin. See, e.g., Fragrancenet.com, 2007 U.S. Dist. LEXIS 48373, at *14. As the court explained in 1-800 Contacts, "[a] company's internal utilization of a trademark in a way that does not communicate it to the public is analogous to a [sic] individual's private thoughts about a trademark." 414 F.3d at 409.

Based on this reasoning, several district courts have found that use of a trademark in the search engine context does not constitute trademark "use." In Merck & Co., the court found that use of a trademark as a keyword to trigger defendants' websites as "sponsored links" did not involve placement of the trademark "on

any goods or containers or displays" nor did it "indicate source or sponsorship." Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 415 (S.D.N.Y. 2006), motion for reconsideration denied by Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 431 F. Supp. 2d 425 (S.D.N.Y. 2006). Therefore, the court held that, in this type of search engine context, the marks were not being "used" in a "trademark sense." Id.

Similarly, in Rescuecom, the court held that use of a trademark as a keyword in search engines is not "use" within the meaning of the Lanham Act. Rescuecom Corp. v. Google, Inc., 456 F. Supp. 2d 393, 403 (N.D.N.Y. 2006) ("Defendant's internal use of plaintiff's trademark to trigger sponsored links is not a use of a trademark within the meaning of the Lanham Act, either because there is no allegation that defendant places plaintiff's trademark on any goods, containers, displays, or advertisements, or that its internal use is visible to the public.").

This district has joined in the holdings of Merck & Co. and Rescuecom, finding no actionable "use" under the Lanham Act where defendants used trademarks in metatags and purchased the trademark as a keyword. In Site Pro-1, Magistrate Judge Ramon E. Reyes, Jr. explained that the "key question is whether the defendant placed plaintiff's trademark on any goods, displays, containers, or advertisements, or used plaintiff's trademark in any

way that indicates source or origin." 2007 U.S. Dist. LEXIS 34107,
at *13. In answering this question in the negative, Magistrate
Judge Reyes explained that "neither the link to [defendant's]
website nor the surrounding text mentions [plaintiff] or
[plaintiff's] trademark. The same is true with respect to
[defendant's] metadata, which is not displayed to consumers." Id.
Most recently, in Fragrancenet.com, United States District Judge
Joseph F. Bianco reached the same conclusion, holding no trademark
"use" based on defendant's use of plaintiff's trademark as a
keyword in Google or as a metatag on defendant's website. 2007
U.S. Dist. LEXIS 48373, at *31.

In another recent case, the court agreed with the
reasoning in Merck & Co. and Rescuecom but ultimately denied a
motion to dismiss based on distinguishable facts. See Hamzik v.
Zale Corp., No. 06-CV-1300, 2007 U.S. Dist. LEXIS 28981 (N.D.N.Y.
April 18, 2007). In Hamzik, a search of plaintiff's trademark not
only returned defendant's website among the search results, but
plaintiff's trademark also appeared next to the defendant's name.
Id. at *3. In distinguishing the facts from those in Merck & Co.
and Rescuecom, the court held that this distinction could
demonstrate that plaintiff's trademark was associated with the
defendant. Id.

S&L urges this Court to rely on the holding in 1-800

15

Contacts and its progeny and find that S&L's use of AG's Marks in metatags and paid internet advertising does not constitute "use" under the Lanham Act. AG argues that, although the Second Circuit has not specifically addressed this question, this Court should be persuaded by the Ninth and Tenth Circuits, who have recognized Lanham Act claims for use of trademarks in metatags when there is "initial interest confusion." See Australian Gold, 436 F.3d at 1239; Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1018-19 (9th Cir. 2004) (recognizing initial interest confusion); Playboy Enters. v. Netscape Commc'n Corp., 354 F.3d 1020, 1025-26 (9th Cir. 2004) (same); Brookfield Commc'n, 174 F.3d at 1064 (9th Cir 1999).

Initial interest confusion or initial source confusion is a theory under which plaintiffs argue that defendants use the plaintiffs' trademarks in metatags or as keywords to improperly divert internet traffic to the defendants' websites. See Site Pro-1, 2007 U.S. Dist. LEXIS 34107, at *14; see also Brookfield Commc'n, 174 F.3d at 1065 (holding there was initial interest confusion because defendant used plaintiff's trademark to divert people looking for plaintiff's website, thereby "improperly benefit[ting] from the goodwill that Brookfield developed in its mark").

This Court takes note of AG's argument, but finds it is

16

premature. While the Second Circuit has not ruled on trademark use in metatags and the search engine context, it has expressly rejected the initial interest confusion theory prior to a determination of trademark "use". See 1-800 Contacts, 414 F.3d at 412 (dismissing an argument of initial interest confusion because the plaintiff had not yet established "use" in the trademark sense). As mentioned above, "'use' must be decided as a threshold matter, because while any number of activities may be 'in commerce' or create a likelihood of confusion, no such activity is actionable under the Lanham Act absent the 'use' of a trademark." Id. (quoting 15 U.S.C § 1114).

Attached as an exhibit to AG's motion is a printout of a website page depicting the results of a search for the term "Australian Gold." (Def.'s R. 56.1 Stmt., Ex. M.) As can be seen from the exhibit, when a computer user searches for one of the Marks via a search engine, such as Yahoo!, S&L's website appears as one of the sponsored results. (Id.) Much more than that, however, the Marks also appear in the description of the result along with S&L's website: "Buy Discount Tanning Lotion Here – Australian Gold, Swedish Beauty, Designer Skin, Supre and many more all at discounted prices, Fast, flat-fee shipping. www.thesupplenet.com." (Id.)

At first glance, it may seem that the facts in the

instant case are more similar to those in Hamzik than in Merck & Co., Rescuecom, Site Pro-1, and Fragrancenet.com. Upon closer look, however, the facts in Merck & Co. are quite similar and the reasoning is instructive in this situation. One important distinction between this case and Hamzik is that S&L, like the alleged infringer in Merck & Co., actually sells the trademarked Products. Merck & Co., 425 F. Supp. 2d at 415-16 ("Moreover, it is significant that defendants actually sell Zocor (manufactured by Merck's Canadian affiliates) on their websites.") In such a situation, "there is nothing improper with [S&L's] purchase of sponsored links to their websites" when searching for the Marks. Merck & Co., 425 F. Supp. 2d at 416. Accordingly, the Court finds that, by purchasing keywords and sponsored links and using the Marks in its metadata, S&L has not "used" the Marks in the trademark sense and, therefore, does not provide an independent basis for a trademark infringement claim. The Court GRANTS S&L's motion for summary judgment in this limited fashion.

2. "Use" Of Marks On Website

Unlike S&L's use of the Marks in metatags and keyword advertising, trademark "use" with respect to S&L's use of the Marks on its website is not seriously disputed. See Merck & Co., 425 F. Supp. 2d at 411 (limiting discussion to the likelihood of confusion where the validity of the mark was not in dispute and the defendant

18

was using the marks on its websites). Accordingly, the Court turns to the remaining elements of a Lanham Act claim and the parties other arguments. Before the Court addresses the likelihood of confusion, however, it will consider S&L's assertion of the first sale doctrine and whether S&L is selling "genuine" Products.

B.    First Sale Doctrine

        Although the first sale doctrine traditionally applies as a defense to copyright infringement claims, courts have recognized it as a restraint on trademark infringement claims as well. See Luxottica Grp. S.p.A. v. Bausch & Lomb Inc., 160 F. Supp. 2d 545, 552 (S.D.N.Y. 2001) (quoting Polymer Tech. Corp. v. Mimran, 975 F.2d 58, 61-62 (2d Cir. 1992)) ("'As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not [specifically] authorized by the mark owner.'"); see also Italverde Trading, Inc. v. Four Bills of Lading, 485 F. Supp. 2d 187, 209 (E.D.N.Y. 2007). Accordingly, where a "purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation" under the Lanham Act. Sebastian Int'l, Inc. v. Longs Drug Stores Corp., 53 F.3d 1073 (9th Cir. 1995). This doctrine is based on the premise that the consumer is not being deceived; they are receiving exactly what they have bargained for. See id. at 1075.

In the March Order, the Court held that S&L could not rely on the first sale doctrine at that stage because AG alleged that S&L did more than simply stock and display the Products for sale. March Order at 13-15. AG alleged that S&L's activities, if found to be true, suggested an affiliation between S&L and AG, which would render the first sale doctrine inapplicable. S&L now contends that it should be granted summary judgment based on the first sale doctrine because AG has failed to prove that S&L's activities suggest an affiliation between S&L and AG. Once again, the Court disagrees.

It is undisputed that S&L takes photographs of the Products and then places its tradename and logo either adjacent to or superimposed over the image of the Products. (Def.'s R. 56.1 Stmt. ¶ 51.) In addition, S&L adds the phrase "All Rights Reserved" directly beneath the image of the Products. (Id. ¶ 52.) These actions go beyond merely "stocking and displaying" the Products. See Stormor, a Div. of Fuqua Indus. v. Johnson, 587 F. Supp. 275, 279 (W.D. Mich. 1984) (finding first sale doctrine inapplicable where defendant placed plaintiff's trademark in defendant's booth at a trade show and in a trade journal advertisement and stamped the defendant's name on plaintiff's promotional literature).

C.  Genuine Products

The analysis of the first sale doctrine is closely tied to AG's argument that S&L is not selling "genuine" Products because it fails to follow AG's quality control standards.  The first-sale doctrine restricts trademark infringement claims only when the products beings resold are genuine.  See Luxottica Grp., 160 F. Supp. 2d at 552.  Similarly, the Lanham Act does not reach the sale of genuine goods.  See Polymer Tech., 975 F.2d at 61.  Essentially, it is the same argument labeled differently.

AG contends that S&L's failure to provide training or instruction on the use of the Products renders them non-conforming. S&L refutes this argument, first contending that the goods are unadulterated and second attacking AG's quality control standards. It is undisputed that S&L does not alter or even repackage the Products themselves.  Accordingly, the Court focuses on the quality control theory.

This Circuit has recognized that

[d]istribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image.  If so, the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder and its distribution constitutes infringement.

Warner-Lambert Co. v. Northside Dev. Co., 86 F.3d 3, 6 (2d Cir.

1996); see also El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392, 395 (2d Cir. 1986); Perkins School for the Blind v. Maxi Aids Inc., 274 F. Supp. 2d 319, 323 (E.D.N.Y. 2003). In fact, this Circuit has stated that "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." El Breco, 806 F.2d at 395. To be entitled to relief, however, "a trademark holder is not required to adopt the most stringent quality control procedures available." Warner-Lambert, 86 F.3d at 6. Rather, to state a claim for such unauthorized distribution, "the trademark holder must allege that: (i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." Id.

As the Court determined in the March Order, AG sufficiently alleged a claim for trademark infringement based on a quality control theory. March Order at 12-13. On a motion for summary judgment, however, the standard is quite different. The moving party must establish that there are no genuine issues of material fact that AG has actually established such quality control procedures, follows them, and that S&L's sales will diminish the value of the Marks. S&L challenges whether AG actually monitors

and follows through with its procedures. In addition, S&L argues that there is a disconnect between the training provided and the ultimate consumer. (Pl.'s Mot. in Supp. 9-10.)

AG distributes the Products through authorized distributors who agree to restrict the resale of the Products to salons that provide tanning services as a majority of their businesses. (Hartlieb Dep. at 38.) The Distributor Agreements also require that the distributors work with AG on training their staff and the staff of the salons to whom they sell. (Id. at 46.) AG claims that to ensure proper use of the Products and to protect its reputation, it only authorizes the sale of the Products to the public through tanning salons. Additionally, AG claims that it provides extensive training to its distributors and tanning salons. To this end, it is undisputed that (1) AG maintains a training department that meets with and sends trainers to tanning salons to instruct salon owners, managers, and employees in the proper use of the Products, (2) distributors are required to (a) attend two seminars each year regarding the training of tanning salon personnel and (b) make their sales associates available for additional training twice each year, (3) AG hosts an additional yearly seminar at which it provides additional training, (4) AG's training department meets with and trains over 30,000 people and conducts over 600 presentations in a typical year, (5) to date, AG

has spent over $1.5 million in training, (6) AG performs routine store checks to ensure that the Products are being sold to businesses operating as tanning salons pursuant to the Distributor Agreement, (7) AG does not authorize the sale of the Products over the internet and actively "polices" such sales, and (8) AG maintains and distributes a "do not sell list" comprised of persons who are not authorized to sell its Products. (Def.'s R. 56.1 Stmt. ¶¶ 14-19, 21-22, 24, 26.)

S&L claims, however, that while AG makes great efforts to train its distributors and requires distributors to train salon personnel, it "does nothing to ensure that all salon customers receive training." (Pl.'s Mem. in Opp'n 23.) In other words, there are no quality controls in place to ensure that the ultimate user, the salon customer, and same persons to whom S&L sells the Products, receive any kind of training or instruction on the use of the Products. Moreover, S&L contends that there are distributors who do not attend training. (Pl.'s R. 56.1 Stmt. ¶ 56.)

S&L relies heavily on <u>Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.</u>, a case from the Fifth Circuit with extraordinarily similar facts to the underlying facts. 988 F.2d 587 (5th Cir. 1993). Matrix manufactured hair care products and restricted the sales of its products to the public through licensed cosmetologists. <u>Id.</u> at 589. The restriction was designed to

24

ensure that customers would only use the hair care products after a consultation and/or direction by a cosmetologist. Matrix spent several million dollars each year training cosmetologists in the use and sale of its products. Id. Matrix did not, however monitor or otherwise ensure that consumers purchased its products only after a consultation. Id. The defendant, Emporium, was a retail drug store that sold Matrix products at a substantial discount and without Matrix's permission. Id.

The Fifth Circuit denied summary judgment, rejecting the identical arguments that AG now makes to this Court. Namely, the court held that "although Matrix spends a great deal of time and money educating cosmetologists in the use and sale of its products, it does not require, monitor, or otherwise attempt to insure that consumers who purchase Matrix products in salons are assisted by a cosmetologist in selecting the proper Matrix product." Id. at 592. The court further stated that "if a pre-sale consultation is a necessary part . . . of a 'genuine' Matrix product, then many of the sales that occur in salons are not sales of 'genuine' Matrix products either. Id.

Ultimately, the court's decision rested on the fact that Matrix had failed to establish customer confusion. Id. at 591. In distinguishing the facts in Matrix from cases in which courts recognized a viable quality control claim, the Fifth Circuit noted

that in the latter group of cases, the products involved had or
could have had a "latent product defect due to the unauthorized
distributor's failure to observe the manufacturer and mark owner's
rigorous quality control standards. Most importantly, a consumer
would not necessarily be aware of the defective condition of the
product and would thereby be confused or deceived." Id.; see also
El Greco, 806 F.2d at [ ] (holding that shoes imported by defendant
were not "genuine" because they had not undergone quality
inspection by the plaintiff, which was required by plaintiff before
it sold shoes in the United States); Shell Oil Co. v. Commercial
Petroleum, Inc., 928 F.2d 104, 107 (4th Cir. 1991) (prohibiting
defendant from selling bulk oil under Shell trademarks because it
did not observe the strict tank and line cleaning requirements that
Shell required to ensure the trademarked oil was not subject to
residue impurities). In Matrix, however, customers who bought
Matrix products from Emporium were not "confused or deceived as to
whether they were getting a cosmetologist's consultation with their
purchase." Id.; see also H.L. Hayden Co. of N.Y., Inc. v. Siemens
Medical Sys., Inc. 879 F.2d 1005, 1022-24 (2d Cir. 1989) (holding
trademarked dental equipment manufactured by plaintiff to be
genuine even though defendant did not install the equipment it
sold, and plaintiff required distributors to install such
equipment, where customers knew that the equipment they purchased

26

from defendant was only plaintiff's manufactured product and did not include installation). More importantly, there was no possibility that the Matrix products were defective in any manner; Matrix manufactured and inspected the products. Rather, the issue was whether customers received instructions on use; the actual products being sold by Emporium were identical to the Matrix products being sold by salons.

Although not binding, this Court finds the thorough and well-reasoned opinion in Matrix particularly persuasive. S&L sells Products that are manufactured, packaged, and inspected by AG; therefore, there is no possibility that such Products contain latent defects of which consumers would be unaware. The sole issue is that customers purchasing the Products from S&L are not receiving the benefit of training or instructions on use by a salon. But when a customer purchases a product off the internet, the customer does not expect that they will receive individualized instruction on how to use the product. As a result, the Court finds unavailing AG's argument that S&L is not selling "genuine" Products because it fails to follow AG's quality control standards.

Having found the first-sale doctrine inapplicable and AG's quality control argument unavailing, the Court now addresses the remaining elements of a Lanham Act claim.

    D.    <u>Likelihood Of Confusion</u>

"Likelihood of confusion exists where 'numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark,'" Rush Indus., Inc. v. Garnier LLC, No. 05-CV-4910, 2007 U.S. Dist. LEXIS 52631, at *7 (quoting Playtex Prods., Inc. v. Georgia-Pacific Corp., 390 F.3d 158, 161 (2d Cir. 2004)), or "are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark." Merck & Co., 425 F. Supp. 2d at 411 (internal quotation marks omitted).

   In determining whether a likelihood of confusion exists, courts are guided by the Polaroid factors, which include (1) strength of plaintiff's mark; (2) similarity of competing marks; (3) competitive proximity of the products; (4) likelihood that plaintiff will bridge the gap between the markets in which the products are sold; (5) actual confusion; (6) defendant's good faith in adopting the mark; (6) quality of defendant's product; and (8) sophistication of the buyers. Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961). This list in not exhaustive, and no one factor is dispositive. Rather, the Court "must focus on the ultimate question of whether consumers are likely to be confused." Merck & Co., 425 F. Supp. 2d at 411. Furthermore, "summary judgment may be appropriate even without

consideration of each of the _Polaroid_ factors." _Rush_, 2007 U.S. Dist. LEXIS 52631, at *9.

Notably, S&L fails to seriously address the _Polaroid_ factors and, instead, argues, based on only one factor – actual confusion – that it is entitled to summary judgment. S&L's contention of lack of actual confusion is primarily based on the fact that AG has failed to conduct a consumer survey or introduce expert testimony on this point. (Pl.'s Mem. 8 (_citing_ _Essence Communc's, Inc. v. Singh Indus., Inc._, 703 F. Supp. 261, 269 (S.D.N.Y. 1988).) AG contends that it has introduced evidence of actual consumer confusion and, moreover, that whether there is a likelihood of confusion involves issues of fact for the jury and may not be properly resolved on summary judgment. (Def.'s Opp'n 14-15.)

First, S&L's reliance on _Essence Communications_ in support of its contention that it should be granted summary judgment because AG failed to offer proof of actual confusion is misplaced. While the court did state that "failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown[,]" the statement was made in analyzing _one_ of the _Polaroid_ factors. _Essence Communc's_, 703 F. Supp. at 269. The court found that, based on the failure to conduct a survey, the actual confusion factor strongly favored

defendants; not that summary judgment should be granted or denied on this factor alone. Id.

Second, AG submitted an email in which a salon owner questioned AG as to whether S&L was an authorized distributor. (Hartlieb Dep. Ex. 5.) AG contends that this email is proof of actual confusion. S&L argues that the email (1) should not be considered because it was not produced in discovery, (2) was written by a salon owner, not a consumer, (3) does not indicate that he was actually confused because he merely asked whether S&L was an authorized distributor, and (4) does not indicate that the sender had ever seen the Websites.[3] (Pl.'s Opp'n 19.) Even assuming, however, that this factor weighs in favor of Plaintiff, summary judgment on this finding alone is inappropriate. The Court must analyze the remainder of the Polaroid factor and other conduct associated with likelihood of confusion before making a determination.

The parties have not sufficiently addressed the Polaroid

---

[3] S&L also argues that a likelihood of confusion cannot exist based on AG's theory of quality control standards. As explained in Section II.C., supra, the Court rejects AG's quality control theory because there is no possibility that the Products contain latent defects of which consumers would be unaware and there is no fear that the customer would expect to receive individualized instruction when purchasing the Products off the internet. The Court need not address these arguments again. Dismissal of this argument, however, does not preclude a finding of likelihood of confusion based on other facts not addressed by S&L.

factors to enable the Court to make a determination, as a matter of law, that there is no likelihood of confusion. Moreover, S&L's attempt to avoid confusion by placing a general disclaimer on its Websites does not allow the Court to conclude, as S&L suggests, that there is no likelihood of confusion. The disclaimer does not specifically mention AG, the Products or the marks. While it is one factor to consider when analyzing the likelihood of confusion, it is not dispositive.

Accordingly, the Court finds that S&L has failed to show the absence of likelihood of confusion rendering summary judgment inappropriate.

E.   The Nominative Fair Use Doctrine

S&L moves this Court to grant it summary judgment based on the "nominative fair use doctrine." The nominative fair use doctrine evolved in the Ninth Circuit's holding in The New Kids on the Block v. News America Publishing Incorporated, 971 F.2d 302 (9th Cir. 1992). In New Kids, the Ninth Circuit held that "a commercial user" who is not using someone else's mark to refer to his own product "is entitled to a nominative fair use defense provided he meets the following three requirements: First, the product . . . must be one not readily identifiable without use of the trademark; second, only so much of the mark . . . may be used as is reasonably necessary to identify the product . . .; and

third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." 971 F.2d at 308; see also Chambers v. Time Warner, Inc., 282 F.3d 147, 156 (2d Cir. 2002) (impliedly recognizing this Circuit's adoption of the New Kids nominative fair use defense).

S&L uses photographs of the Products on the Websites, with S&L's logos placed underneath or over the Marks. Such conduct could lead a consumer to believe that AG sponsored, endorsed, or otherwise approved of S&L's use of the Marks. Accordingly, there are genuine issues of material fact as to whether S&L has engaged in practices that suggest AG's endorsement or sponsorship of the sale of the Products on the Websites.

For the reasons discussed in Sections II.A-E, S&L's motion for summary judgment on AG's Trademark Infringement and Unfair Competition Claim is (1) DENIED as far as it is premised on S&L's use of the Marks on its Websites and (2) GRANTED as far as it is premised on S&L's purchase of keywords and sponsored links and use of the Marks in metatags.

F.   False Designation Of Origin

AG moves for summary judgment on its cross claim for false designation of origin seeking the Court to enjoin S&L from using its trade names and logos in connection with AG's Products on the Websites. Section 43(a) of the Lanham Act prohibits "false

reference to the origin of a work, or a reference which is misleading or likely to [cause] confus[ion]" as to the origin. <u>Waldman Publishing Corp. v. Landoll, Inc.</u>, 43 F.3d 775, 780 (2d Cir. 1994).

> The section has been interpreted as prohibiting misrepresentations as to the source of a produce in primarily two types of activities: (1) false advertising and (2) 'passing off' (also called 'palming off') in which 'A' sells is product under 'B's' name . . . . However, section 43(a) also prohibits a practice termed 'reverse passing off,' in which 'A' sells 'B's' product under 'A's' name.

<u>Id.</u> (citations omitted).

AG proceeds on a theory of reverse passing off. In other words, AG alleges that by placing (1) its logos adjacent to or superimposed over images of the Products on S&L's Websites and (2) "All Rights Reserved" near the images, S&L is selling AG's products under S&L's name, or at least causing confusion as to the origin of the Products. (AG's Mem. 9.)[4]

To succeed on a reverse passing off claim, AG must

---

[4]  To be clear, AG's false designation of origin claim is "separate and distinct" from its copyright infringement claim. <u>Waldman Publishing</u>, 43 F.3d at 781. The reverse passing off claim relates to all Products near which, or on which, S&L has placed its logo, not just AG's copyrighted works. <u>See id.</u> ("the Copyright Act and the Lanham Act address different harms. Through a copyright infringement action, a copyright owner may control who publishes, sells or otherwise uses a work. Through a Lanham action, an author may ensure that his or her name is associated with a work when the work is used.")

establish:

> (i) that the work at issue originated with the plaintiff; (ii) that the origin of the work was falsely designated by the defendant; (iii) that the false designation of origin was likely to cause consumer confusion; and (iv) that the plaintiff was harmed by the defendant's false designation of origin.

Carell v. The Shubert Org., Inc., 104 F. Supp. 2d 236, 259 (S.D.N.Y. 2000) (citing Waldman Publishing, 43 F.3d at 781-85). S&L's main argument is that there is no likelihood of confusion with respect to its actions as evidenced by the lack of actual confusion and consumer surveys. S&L further contends that since it did not remove AG's Marks from the Products, it did not engage in reverse passing off. (S&L's Opp'n 19-20.)

Typically, reverse palming off claims arise when the alleged wrongdoer removes the creator's name and tries to pass off the product as his own. S&L did not remove AG's name from the Products; however, it did place its logos and trade names near or on the images of the Products. While AG submitted one email from a salon owner questioning whether S&L is an authorized distributor, this alone is insufficient to establish likelihood of confusion concerning the origin of the Products. AG has offered no evidence showing that customers are confused as to whether AG is the creator of the Products. As such, AG has failed to create a material issue of fact as to likelihood of confusion. Accordingly, AG's claim for

34

false designation of origin based on reverse palming off is DISMISSED.

## III. AG's Lanham Act Claims For False Advertising

Both parties agree that to prevail on a claim for false advertising under the Lanham Act "a plaintiff must demonstrate the falsity of the challenged advertisement, by proving that it is either (1) literally false, as a factual matter; or (2) implicitly false, i.e., although literally true, still likely to mislead or confuse consumers." McNeil-PPC, Inc. v. Pfizer Inc., 351 F. Supp. 2d 226, 248 (S.D.N.Y. 2005) (citing Societe de Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P., 380 F.3d 126, 132 (2d Cir. 2004)). Furthermore, "the false or misleading statement must be material." McNeil-PPC., 351 F. Supp. 2d at 248. In analyzing a false advertising claim, courts should "consider the advertisement in its entirety and not . . . engage in disputatious dissection." Avis Rent A Car Sys., Inc. v. Hertz Corp., 782 F.2d 381, 385 (2d Cir. 1986) (internal quotation marks omitted).

S&L moves for summary judgement on this claim based on the arguments that AG has not identified any material statements that are literally false and cannot establish that the advertisement is likely to mislead or confuse consumers. In its opposition, however, AG explains that it is proceeding on a literally false claim. Specifically, AG contends that by placing

35

"All Rights Reserved" at the bottom of the images of AG's Products on S&L's Websites, S&L has falsely proclaimed that S&L is the creator of the images of AG's Products and its copyrighted label artwork. (AG's Opp'n 16.) AG also claims that, at a minimum, their false advertising claim raises triable issues of fact. S&L avers that it takes pictures of the Products to place on its Website and includes the "All Rights Reserved" language to prevent competitors from copying its images of the Products. (S&L R. 56.1 Stmt. ¶ 87.)

Lanham Act claims for false advertising typically involve facts in which a party has included a false or misleading fact concerning the nature, characteristics, or qualities of goods or services. See Societe de Hotels Meridien, 380 F.3d at [132]; Imig, Inc. v. Electrolux Home Care Prods., No. 05-CV-0529, 2007 U.S. Dist. LEXIS 20530, *39-40 (E.D.N.Y March 22, 2007). These claims often manifest themselves in statements that one product is superior to the other, with tests to prove it. See Imig, Inc., 2007 U.S. Dist. LEXIS 20530, at *40. "The nature of proof required varies based on the nature of the advertisement." Id. There are no such claims here. S&L is not using AG's Products to show that its products are superior; S&L does not make any of its own tanning products. Rather, S&L is advertising AG's Products in an effort to sell AG's Products. In doing so, however, S&L places the phrase

36

"All Rights Reserved" directly beneath images of the Products.

The Court fails to see how placement of a photograph of AG's Products on S&L's Websites, even with "All Rights Reserved" appearing directly beneath the image, constitutes a literally false advertisement. Assuming, _arguendo_, that it is a literally false advertisement, the Court finds the phrase "All Rights Reserved" is not material to the advertisement in its entirety.

Furthermore, the Court finds that the advertisement is not implicitly false either. In raising an implied claim, AG "must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers." Merck & Co., 425 F. Supp. 2d at 417 (alteration in original) (quoting Johnson & Johnson*Merck Consumer Pharms. Co. v. Smithkline Beecham Corp., 960 F.2d 294, 297 (2d Cir. 1992)). In this type of claim the focus is on what the public perceives the message to be. See id. Once the district court has determined "what message was actually conveyed to the viewing audience," it then determines the truth or falsity of the message. Johnson & Johnson*Merck, 960 F.2d at 298. Such a determination may not be made "based solely" on the district judge's "own intuitive reaction." Id. at 297.

The Second Circuit has further advised that an implied falsehood claim is typically "proven through the use of a consumer survey that shows a substantial percentage of consumers are taking

37

away the message that the plaintiff contends the advertising is conveying." McNeil-PPC, 351 F. Supp. 2d at 259 (citing Johnson & Johnson*Merck, 960 F.2d at 298). After plaintiff has successfully introduced its consumer survey evidence, "the district court must then evaluate whether the message is false or likely to mislead or confuse." McNeil-PPC, 351 F. Supp. 2d at 249. In making this determination, the court may consider the commercial context, defendant's prior advertising history, sophistication of the advertising audience, the text and images used in the advertisement, and the evidence offered to prove or disprove the truth of the advertisement. Id. It is not required, however, that the plaintiff rely on consumer survey evidence if the plaintiff "adequately demonstrates that a defendant has intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard is of an egregious nature." Johnson & Johnson*Merck, 960 F.2d at 298-99 (internal quotation marks omitted).

AG has not offered any consumer surveys, expert reports, or consumer complaints establishing that a substantial percentage of consumers take away the message that S&L is the creator of AG's product images and copyrighted label artwork. The one purported consumer complaint introduced by AG questions whether S&L is an authorized distributor of the Products, not whether S&L is the creator. Moreover, AG has introduced no evidence that S&L has

38

intentionally set out to deceive the public into believing that S&L is the creator of AG's product images and copyrighted label artwork or that S&L's "deliberate conduct" is of an "egregious nature." Id. Accordingly, AG has failed to prove a claim of false advertising under the Lanham Act and such claim is DISMISSED.

## IV. AG's Claim For Trademark Dilution

S&L also moves to summarily dismiss AG's claim for trademark dilution under the Federal Trademark Dilution Act ("FTDA").[5]

> The FTDA permits the owner of a qualified famous mark to enjoin junior uses throughout commerce, regardless of the absence of competition or confusion . . . . [T]o establish a violation of the FTDA, a plaintiff must show that: (1) its mark is famous; (2) the defendant is making commercial use of the

---

[5] The Trademark Dilution Reform Act of 2006 ("TDRA") became effective on October 6, 2006, replacing the FTDA. See 15 U.S.C. § 1125(c). Because AG's claims arose prior to October 2006 and AG seeks only monetary damages in connection with its dilution claim, the FTDA and not the TDRA applies. See Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 477 F.3d 765, 766 (2d Cir. 2007) (holding that the TDRA applied to a claim filed before the statute went into effect "to the extent that [the plaintiff] has sought injunctive relief on the issue of dilution") (emphasis added); Louis Vuitton Malletier v. Dooney & Bourke, Inc., No. 04-CV-2990, 2007 U.S. Dist. LEXIS 30671, at *18-19 (S.D.N.Y. Apr. 24, 2007) ("The second sentence of subsection 1125(c)(5), entitling owners of famous marks to dilution damages, contains an unambiguous date restriction that authorizes the application of the 'likelihood of dilution' standard as a basis for recovering damages to civil actions where the diluting mark or trade name was first introduced in commerce after October 6, 2006 . . . . Congress did not intend that the relaxed evidentiary standard would apply retroactively.").

mark in commerce; (3) the defendant's use
began after the mark became famous; and (4)
the defendant's use of the mark dilutes the
quality of the mark by diminishing the
capacity of the mark to identify and
distinguish goods and services.

Savin Corp. v. The Savin Group, 391 F.3d 439, 448-49 (2d Cir. 2004)

(internal quotation marks and citations omitted). S&L contends

that AG fails to sufficiently establish the first element of its

prima facie case of dilution - fame.[6]

It is well settled in this Circuit that to establish that

a mark is famous, as required by the FTDA, "a plaintiff must show

that the senior mark possesses both a 'significant degree of

inherent distinctiveness' and . . . 'a high degree of . . .

acquired distinctiveness." Savin Corp., 391 F.3d at 449 (quoting

TCPIP Holding. Co. v. Haar Commuc'ns Inc., 244 F.3d 88, 97, 98 (2d

Cir. 2001)) (emphasis and alteration in original). Fame is the key

element in a FTDA claim. Savin Corp., 391 F.3d at 449. Generally,

[t]he degree of fame required for protection
under the FTDA must exist in the general
marketplace, not in a niche market. Thus,
fame limited to a particular channel of trade,
segment of industry or service, or geographic
region is not sufficient to meet this

---

[6] Because the Court has rejected S&L's reliance on the
nominative fair use doctrine to grant it summary judgment, the
Court need not address its arguments to dismiss AG's dilution
claim based on applicability of the nominative fair use doctrine.
Accordingly, the Court only analyzes S&L's argument that AG has
failed to prove one of the elements of a trademark dilution
claim.

standard.

_Id._ at 450 n.6 (_quoting_ _Christopher D. Smithers Found., Inc. v. St._ _Luke's-Roosevelt Hosp. Ctr._, No. 00-CV-5502, 2003 U.S. Dist. LEXIS 373, at *15-16 (S.D.N.Y. Jan. 13, 2003) (in turn _citing_ _TCPIP_ _Holding_, 244 F.3d at 99)).

In support of its motion, S&L cites to _Empresa Cubana del_ _Tabaco v. Culbro Corporation_, a Southern District case, which held that the "COHIBA" trademark for cigars did not qualify as a famous mark because "the fame required must exist in the general marketplace, not in a niche market." No. 97-CV-8399, 2004 U.S. Dist. LEXIS 4935 (S.D.N.Y. March 29, 2004). The holding in _Emprasa_ _Cubana del Tabaco_ need not detain the Court for very long; not only is _Empresa Cubana del Tabaco_ not binding on this Court, it did not involve an FTDA claim, and it was decided before the Second Circuit issued its ruling in _Savin Corporation_. _Emprasa Cubana del Tabaco_, 2004 U.S. Dist. LEXIS 4935, at *97 (explaining that the FTDA standard was inappropriate).

In _Savin Corporation_, the Second Circuit found the following facts sufficient to withstand summary judgment under the FTDA:

> [Plaintiff] spent over $20 million on advertising in 2002 and has achieved annual revenues of $675 million. Further, Plaintiff's products and services are regularly featured in print advertisements, trade magazines[,]

> and tradeshow promotions. Plaintiff's
> advertisements have appeared in well known
> magazines such as <u>Newsweek</u>, <u>Time</u>, and <u>Business
> Week</u>.

391 F.3d at 450 (internal quotation marks omitted). Moreover, the

court stated that a plaintiff who "has shown more than a mere

scintilla of evidence of fame" submits a "sufficient quauntum of

proof" to have the claim submitted to the jury. <u>Id.</u> (internal

quotation marks omitted). Here, AG submits that 50% to 60% of the

25,000 tanning salons in the United States carry one of their

tanning Products, (AG's Opp'n 17.), and AG's Products comprise

approximately 20% to 40% of S&L's overall sales of tanning

products. (AG R. 56.1 Stmt. ¶ 30; Mercadante Dep. 195-96; Sagarin

Dep. 71.) Unlike <u>Savin Corporation</u>, however, AG does not offer any

evidence indicating significant expenditures on advertising, extent

of advertising, or annual revenues. <u>See</u> <u>TCPIP Holding</u>, 244 F.3d at

99 (concluding that "The Children's Place" did not meet the

requirement of "fame" where plaintiff stated that it operated 228

retail stores in 27 states under the mark but did not indicate how

many millions it spent on advertising or how effective such

advertising was and it failed to submit any consumer surveys, press

accounts or other evidence of fame). Construing the facts in a

light most favorable to AG, the non-moving party, the Court finds

that AG has not even shown "more than a mere scintilla of evidence"

of fame. Savin Corp., 391 F.3d at 450.

To prevail on a dilution claim under New York law, AG must show (1) that it possesses distinctive trademarks, and (2) that S&L's use of those trademarks results in a likelihood of dilution. See New York Stock Exch., Inc. v. New York, New York Hotel, LLC, 293 F.3d 550, 557 (2d Cir. 2002). A trademark is distinctive under New York law if it is inherently distinctive or if it has acquired secondary meaning. Id. Although New York law does not require that the trademark be famous, courts in this Circuit have held that "the standards for establishing the distinctiveness required to show dilution under New York law closely resemble the standards for fame under the [Lanham Act]." SMJ Group, Inc. v. 417 Lafeyette Rest. LLC, No. 06-CV-1744, 2006 U.S. Dist. LEXIS 61645, at *10 (S.D.N.Y. Aug. 30, 2006). Secondary meaning exists where "the public is moved in any degree to buy an article because of its source." Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 n.4 (2d Cir. 1997) (citation omitted). Factors that are considered in determining whether a mark has developed secondary meaning include "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use." Id.; see also ITC Ltd. v.

Punchgini, Inc., 482 F.3d 135, 167 (2d Cir. 2007). For the reasons that AG's claim for dilution fails under federal law, it also fails under state law. Accordingly, S&L's motion for summary judgment with respect to AG's dilution claim is GRANTED.

## V.  AG's Copyright Claim

Both AG and S&L move for summary judgment on AG's counterclaim against S&L for copyright infringement. AG's theory of recovery is that S&L's photographs of AG's copyrighted artwork, which S&L displays on its Website, constitute derivative works in violation of the Copyright Act of 1976, 17 U.S.C. § 101 et seq. ("Copyright Act").

> Section 106 of the Copyright Act grants
> copyright holders a bundle of exclusive
> rights, including the right to 'reproduce the
> copyrighted work in copies,' and the right 'to
> prepare derivative works based upon the
> copyrighted work.'

Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 607-08 (2d Cir. 2006) (quoting 17 U.S.C. § 106).

### A.  17 U.S.C. § 113(c)

S&L does not dispute that AG owns copyrights in the artwork on the labels of the Products or that S&L took photographs of the copyrighted artwork. Rather, S&L contends that its conduct is protected by the plain language of the Copyright Act, specifically 17 U.S.C. § 113(c).

Section 113 carves out exceptions to the substantial rights granted in Section 106. Specifically, Section 113(c) provides that

> [i]n the case of a work lawfully reproduced in useful articles that have been offered for sale or other distribution to the public, copyright does not include any right to prevent the making, distribution, or display of pictures or photographs of such articles in connection with advertisements or commentaries related to the distribution or display of such articles, or in connection with news reports.

17 U.S.C. § 113(c). S&L urges the Court to summarily dismiss AG's copyright claim based on this language. There is very little case law interpreting Section 113(c), and AG does not directly address this argument. Underlying AG's copyright claim, however, is the claim that S&L did not "lawfully" reproduce the artwork. In other words, any photographs of the Products and, thus the copyrighted artwork, were unauthorized. Accordingly, S&L's reliance on Section 113(c) is unavailing.

B.   <u>Fair Use Doctrine</u>

S&L also argues that its conduct is protected by the fair use doctrine. AG contends, however, that S&L has waived the affirmative defense of fair use. In the Second Amended Counterclaim, AG added a claim for copyright infringement. While S&L's Answer to the Second Amended Counterclaim raised fair use as an affirmative defense to AG's trademark infringement claim, it did

45

not raise fair use with respect to the copyright infringement claim.

1. <u>Waiver</u>

Although fair use is a defense provided for by the Copyright Act, 17 U.S.C. § 107, it has been considered an affirmative defense. <u>See</u> <u>Infinity Broad. Corp. v. Kirkwood</u>, 150 F.3d 104, 107 (2d Cir. 1998) ("Since fair use is an affirmative defense to a claim of infringement, the burden of proof is on its proponent."); <u>see also</u> <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 590, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994); <u>S.A.R.L. Louis Feraud Int'l v. Viewfinder, Inc.</u>, 489 F.3d 474, 484 n.7 (2d Cir. 2007). When a party has failed to plead an affirmative defense, it is generally considered waived. <u>See</u> Fed. R. Civ. P. 8(c); <u>see</u> <u>also</u> <u>Schwind v. EW & Assocs.</u>, 367 F. Supp. 2d 691, 697 (S.D.N.Y. 2005)

There are instances, however, when courts will consider an affirmative defense raised on a motion for summary judgment because the other side has had ample opportunity to respond. <u>See</u> <u>Schwind</u>, 367 F. Supp. 2d at 697 ("The Second Circuit has held that 'a district court may consider the merits of an affirmative defense - even one explicitly listed as such in Fed. R. Civ. P. 8(c) - raised for the first time at the summary judgment stage, so long as the plaintiff has had an opportunity to respond.'" (quoting <u>Astor Holdings, Inc. v. Roski, III</u>, 325 F. Supp. 2d 251 (S.D.N.Y. 2003)

(citing _Curry v. City of Syracuse_, 316 F.3d 324, 330-31 (2d Cir. 2003) (allowing collateral estoppel to be raised as an affirmative defense even though raised for the first time in reply memorandum in support of a motion for summary judgment where plaintiff was provided notice, had an opportunity to respond and was not prejudiced by failure to plead the affirmative defense in its answer))). Courts also consider factors underlying a leave to amend under Rule 15 of the Federal Rules of Civil Procedure in permitting an affirmative defense when such defense was first raised on summary judgment. See _Block v. First Blood Assocs._, 988 F.2d 344, 349-351 (2d Cir. 1993) (affirming district court's consideration of affirmative defense of statute of limitations first raised in summary judgment motion where plaintiff did not show bad faith or prejudice); _Schwind_, 367 F. Supp. 2d at 697 (collecting cases); _Steinberg v. Columbia Pictures Indus._, 663 F. Supp. 706, 715 (S.D.N.Y. 1987) ("absent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion for summary judgment for the first time.").

AG preemptively moved to preclude S&L from relying on fair use in defense of AG's copyright claim. In doing so, AG did not contend that it would be prejudiced by the defense, only that S&L failed to raise it in its Answer to the Second Amended Counterclaims. Because the Court finds that AG had ample

47

opportunity to argue against S&L's reliance on the fair use defense and there is no evidence of bad faith, significant delay, or prejudice, the Court will consider the defense.

2. <u>Analysis</u>

17 U.S.C. § 107 sets forth a non-exhaustive list of factors for courts to consider when determining whether a party's infringing conduct should be protected because it constitutes fair use. It is well settled that the determination of fair use is "an open-ended context-sensitive inquiry." <u>Blanch v. Koons</u>, 467 F.3d 244, 251 (2d Cir. 2006). While courts must consider the four factors enumerated in the statute, they are not limited to such factors and, instead, should engage in a case-by-case analysis. <u>See</u> <u>id.</u> at 250-51. It should be noted that fair use is a mixed question of law and fact. <u>See</u> <u>id.</u> at 250. Whether a party's actions constitute fair use, however, may be decided on summary judgment where there are no genuine issues of material fact. <u>See</u> id.

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

As S&L readily admits, its use of AG's copyrighted artwork is clearly commercial. S&L contends, however, that its use is transformative. The Supreme Court has held that if a new work is transformative, commercial use becomes less important. <u>See</u> <u>Campbell</u>, 510 U.S. at 579.

> The central purpose of this investigation is to see . . . whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative.

<u>Id.</u> (internal quotation marks and citation omitted). The Second Circuit has, on numerous occasions, interpreted and applied this standard. Essentially,

> if the secondary use adds value to the original -- if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings -- this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.

<u>Blanch</u>, 467 F.3d at 251-52 (internal quotation marks and citation

omitted).

S&L contends that if it had used AG's artwork to market its own brand of tanning products, such use would not satisfy the transformative standard. But, S&L argues, S&L has posted small, low-resolution images of AG's Products, which serves an entirely different function from AG's copyrighted artwork. The Court disagrees. Both AG and S&L use the artwork to market the Products; the use is identical not transformative. S&L has not started with AG's artwork and transformed it into "new information, new aesthetics, new insights and understandings." Id. Accordingly, the "purpose and character" factor weighs in favor of AG.

The second factor – nature of the copyrighted work – weighs slightly in favor of AG. The two considerations with respect to this factor is (1) whether the work is creative or more factual and (2) whether the work is published or unpublished. See Blanch, 467 F.3d at 256. S&L contends that although there may have been creativity in designing the labels, the labels are functional – they are used to sell the Products. The labels are creative; however, as S&L points out, they do not seem to be at the core of intended copyright protection. Furthermore, the labels have been widely disseminated and, therefore, are more akin to a published work than an unpublished work. Nevertheless, this factor weighs slightly in favor of AG because of the creative nature of the

labels.

The next factor asks whether "quantity and value of the materials used are reasonable in relation to the purpose of the copying." Campbell, 510 U.S. at 586 (internal quotation marks omitted). The Court finds this factor weighs in favor of S&L's use. Although S&L used the entire work, such use was reasonable in light of the purpose – to sell the Products. AG's artwork is not easily severable, like a literary piece, video or song. See Mattel, Inc. v. Walking Mountain Prod., 353 F.3d 792, 804 (9th Cir. 2003).

The last statutory factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). The question here is "whether the secondary use usurps the market of the original work." Blanch, 467 F.3d at 258 (internal quotation marks and citations omitted). AG is a manufacturer of tanning products, not label artwork. The only market that S&L's conduct potentially usurps is sale of the Products by salons. This market, however, is not the focus of the final factor; the focus is on the market for the copyrighted artwork. Accordingly, this factor weighs in favor of S&L's use.

On balance, with two factors weighing in favor of S&L's use and two factors, albeit one only slightly, weighing against S&L's use, the Court also considers the copyright infringement

claim as a whole. As noted, this claim is not the typical copyright infringement claim. Rather, it seems as though AG is attempting to force a claim with facts that do not really fit. S&L puts photographs of AG's Products, including AG's copyrighted artwork, on its Website in order to sell AG's Products at a discounted price. S&L then places its logos and trade names on or near the images of the Products and "All Rights Reserved" directly beneath the images. Considering the statutory factors discussed in detail above and the facts of this case, the Court finds that the "copyright law's objective to promote the Progress of Science and useful Arts" would not be undermined by S&L's conduct. <u>Castle Rock Entm't v. Carol Publ'g Group</u>, 150 F.3d 132, 146 (2d Cir. 1998). As such, the Court finds that S&L has engaged in fair use of AG's copyrighted artwork.

Because S&L's use of AG's copyrighted artwork is protected by the fair use doctrine, the Court need not address the parties' remaining arguments regarding the copyright infringement claim. Accordingly, AG's copyright infringement claim is DISMISSED.

VI.  <u>S&L's Claims Of Unfair Competition</u>

AG moves to summarily dismiss S&L's claim of unfair competition, although, until S&L filed it opposition, it was not exactly clear on what grounds such claim was brought. As explained

by S&L, the gravaman of its cause of action for unfair competition,

under both the Lanham Act and New York law,[7] is that AG forced S&L

into bringing this action for a declaratory judgment by making

"baseless trademark related threats" and, therefore, AG should be

held liable for unfair competition. (S&L's Opp'n 4.) In support

of this argument, S&L cites to cases from more than 20 years ago,

some of which concern anti-trust law. See Clipper Express v. Rocky

Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240 (9th Cir. 1982);

T.N. Dickinson Co. v. LL Corp., No. 84-CV-283, 1985 WL 14175 (D.

Conn. 1985); Puritan Sportswear Corp. V. Shure, 307 F. Supp. 377

(W.D. Pa. 1969)

Firstly, S&L's trade names and logos are not being used

in any manner by AG. Secondly, the fact that, in the anti-trust

context, a single baseless lawsuit can constitute an unlawful

business practice, is completely irrelevant as to whether S&L has

sufficiently met the elements of a Lanham Act claim for unfair

competition. See Clipper Express, 690 F.2d at 1254. Finally, S&L

commenced this action, not AG. Assuming, however, that S&L was

forced to seek a declaratory judgment to avoid suit by AG, S&L's

claim for unfair competition still fails. There is no evidence

---

[7] S&L admits that the elements of unfair competition are the
same as those under the Lanham Act, with the additional
requirement of an allegation of bad faith. See Conmed Corp. v.
Erbe Electromedizin GMBH, 129 F. Supp. 2d 461, 470 (N.D.N.Y.
2001).

that AG's threats against S&L were baseless. The fact that such claims are not being dismissed on summary judgment indicates, at least, that they are not a "sham." Moreover, the threat of bringing a trademark infringement claim does not constitute unfair competition. See Gemveto Jewelry Co. v. Jeff Cooper, Inc., 568 F. Supp. 319, 338 (S.D.N.Y. 1983), vacated and remanded on other grounds, 800 F.2d 256 (2d Cir. 1986) ("The assertion by the defendants of these claims against plaintiff who was trying to protect its patents against defendants' unethical conduct is an outstanding example of chutzpah to the nth degree.") (internal quotation marks omitted). The Court finds that S&L's claim for unfair competition fails as a matter of law.

VII. State Law Claims

   A.   AG's Claim For Tortious Interference With Contract

S&L argues that it did not tortiously interfere with any contracts and thus should be granted summary judgment on AG's counterclaim. In New York, a tortious interference with contract claim has four elements:

> (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional and unjustifiable inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff.

John Paul Mitchell Sys. v. Quality King Distrib., Inc., 106 F.

Supp. 2d 462, 475 (S.D.N.Y. 2000) (citing Kronos, Inc. v. AVX Corp., 81 N.Y. 2d 90, 94 (1993)).

The Court finds that a contract existed between AG and a third party. S&L does not dispute the fact that AG had distribution agreements under which AG sold only to authorized distributors, and in turn, these authorized distributors could sell only to tanning salons. S&L also does not dispute the existence of a contract - a "Premier Salon Agreement" - between AG and Yucatan Tanning, one of S&L's suppliers. (S&L's Mem. 16.) Accordingly, AG met its burden on the first element of a contract existing between AG and a third party.

As for the second element, the Court finds that issues of fact exist as to whether S&L knew of any contracts AG had with third parties. S&L argues that AG cannot prove that S&L knew of these contracts. And even if S&L had general knowledge of AG's contracts, it was not specific knowledge of the terms of AG's contracts.

AG claims that it sent S&L a cease and desist letter, notifying S&L that it was interfering with AG's distributorship agreements. (AG R. 56.1 Stmt. ¶ 64.) AG's cease and desist letter specifically stated that AG sells its Products directly to distributors who in turn sell directly to tanning salons who re-sell to consumers. Accordingly, the Court rejects S&L's argument

that it required specific knowledge of the contractual terms that prohibited the sale of the Products on the internet.

AG's cease and desist letter also pointed out that the agreements specifically prohibited the sale of the Products through website re-marketers such as S&L. (2d Am. Compl., Ex. A.) This raises an issue of fact as to whether S&L knew of AG's contracts with third parties - either generally or specifically.

The next issue is whether the third element is met: specifically, whether S&L intentionally and unjustifiably induced the third parties to breach their contracts with AG. S&L claims that it did not have direct contact with AG's distributors and instead acquired Products from the tanning salons. AG contends this is irrelevant.

AG's argument is persuasive. Whether S&L is twice removed from the contractual relationship between AG and third parties is irrelevant. A defendant can still be held liable for its tortious conduct despite its circuitous conduct. See <u>John Paul Mitchell Sys. v. Pete-N-Larry's, Inc.</u>, 862 F. Supp. 1020, 1029 (W.D.N.Y. 1994) (citing <u>Benton v. Kennedy-Van Saun Mfg. & Eng. Corp.</u>, 152 N.Y.S. 2d 955, 958 (N.Y. App. Div. 1st Dep't 1956)).

The last element that S&L challenges is whether AG had actual damages. S&L claims that AG has not put forth any evidence of their damages. In fact, S&L posits that AG has benefitted from

S&L's online sales of the Products.

Issues of fact abound on this last element of damages. AG has submitted affidavits about the damage to AG's reputation, damage to AG's investment in the exclusive distribution system, and the costly investments AG has made in protecting this exclusive distribution system and preventing online sales of its Products. AG claims that by maintaining this exclusive distribution system, AG can provide accurate counseling to consumers about their Products. (AG R. 56.1 Stmt. ¶ 20; Ex. B. Hartlieb Aff.)

Based on the issues of facts that exist as to the second, third, and fifth elements of AG's claim for tortious interference with contractual relations, the Court DENIES S&L's motion for summary judgment as to this claim. The Court allows this claim to proceed.

B.  AG's Claim For Tortious Interference With Prospective Business Relations

Next, S&L challenges AG's counterclaim for tortious interference with prospective business relations. One of the key elements of this claim - which is quite different from a claim for tortious interference with contractual relations - is that a plaintiff must allege that a "defendant's conduct was motivated solely by malice or to inflict injury by unlawful means, beyond mere self-interest or other economic considerations." Shared

Commc'ns Servs. of ESR, Inc. v. Goldman Sachs & Co., 803 N.Y.S. 2d 512, 513 (N.Y. App. Div. 1st Dep't 2005).

The Court GRANTS S&L's motion for summary judgment as to AG's claim for tortious interference with prospective business relations. S&L claimed that it had no malicious motive and was motivated only by the prospect of economic gain. (S&L's Mem. 19.) AG does not oppose this part of S&L's motion. Further, the Court cannot recall any allegations or submissions of evidence supporting a finding or inference of S&L acting with any malicious motive. Accordingly, the Court DISMISSES AG's claim for tortious interference with prospective business relations.

C.    AG's Claim Under New York General Business Law § 133

New York General Business Law Section 133 prohibits, inter alia, any "person, firm or corporation" from using another corporation's trade name or symbol "with intent to deceive or mislead the public." N.Y. Gen. Bus. L. § 133. S&L moves for summary judgment with respect to this claim arguing that it has never used any "corporate, assumed, or trade name" other than its own. (S&L's Mem. 20.) This portion of S&L's motion is unopposed.

The Court DENIES summary judgment with respect to this claim; however, because it is undisputed that S&L places AG's Marks on its Website along with S&L's trade names and logos, such conduct could, if the requisite state of mind is proven, subject S&L to

58

liability under Section 133.

D.   AG's Eleventh Cause Of Action For Conspiracy

Next, S&L moves for summary judgment on AG's eleventh count for "conspiracy and concert of action." (2d Am. Answer ¶¶ 112-14.) AG's counterclaim alleges that S&L conspired with unknown distributors and other persons to illegally obtain the Products and sell them on the internet. This conduct, AG alleges, constitutes conspiracy and concert of action to tortiously interfere with the Distributorship Agreements and AG's business relationships.

S&L argues that this Court must dismiss this claim because a conspiracy to commit a tort is never the basis for a cause of action. (S&L's Mem. 21.) Case law also supports S&L's argument. "A mere conspiracy to commit a tort is never of itself a cause of action." Alexander & Alexander of N.Y., Inc. v. Fritzen, 68 N.Y.2d 968, 969 (1986) (internal quotation marks and citations omitted). AG has not opposed this portion of S&L's motion for summary judgment.

The Court agrees and DISMISSES AG's claim for conspiracy and concert of action. S&L correctly point out that conspiracy to commit tort is not a cause of action, and AG fails to oppose this argument. Accordingly, the Court GRANTS S&L's motion for summary judgment on AG's claim for conspiracy and concert of action.

## CONCLUSION

For the reasons explained above, S&L's motion for summary judgment is GRANTED in part and DENIED in part, and AG's motion for partial summary judgment is GRANTED in part and DENIED in part. Having previously determined that the claims for which S&L requests a declaratory judgment involve disputed material issues of fact, the Court DENIES S&L's request for a declaratory judgment.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     September 30, 2007
           Central Islip, New York